OAKLAND COUNTY TAXPAYERS' LEAGUE v.
OAKLAND COUNTY SUPERVISORS.

1. COUNTIES—SITE FOR COURTHOUSE—BOARD OF SUPERVISORS—LEGIS-
LATURE.

Statute empowering the board of supervisors of a county "to
fix upon and determine the site of any such [courthouse]
building, if not previously located" conferred power upon the
board to establish the precise site of the courthouse where the
site had not been previously fixed by the legislature (PA 1851,
No 156, § 11).

2. SAME—SITE FOR COURTHOUSE—BOARD OF SUPERVISORS.

Selection of new site for county courthouse by the board of
supervisors without a vote of the people was within the power
of the board, where site was used for last 135 years of county's
existence had been donated for such use and had not been
selected by the legislature (PA 1851, No 156, § 11).

3. SAME—COURTHOUSE—BOARD OF SUPERVISORS—SALE OF PROPERTY—
STATUTES.

Statutory power conferred upon county board of supervisors "to
sell any real estate of their county not donated for any special
purpose" as altered by statute enacted 5 years later authoriz-
ing "the sale or leasing of any real estate belonging to
such county" did not preclude the sale of property donated
to the county for courthouse purposes and used for such pur-
poses for 135 years and use the proceeds to assist in financing
the cost of a new courthouse at a site 2.7 miles distant there-
from (RS 1846, ch 13, § 5; PA 1851, No 156, § 11).

4. MUNICIPAL CORPORATIONS—ANNEXATION—RESIDENT.

Holding of trial court that proceedings to annex township ter-

REFERENCES FOR POINTS IN HEADNOTES

[1, 2]  14 Am Jur, Counties § 16 *et seq.*; 14 Am Jur, Courts § 40.
[3]  14 Am Jur, Counties § 36.
[4]  37 Am Jur, Municipal Corporations § 30.
[6, 14]  42 Am Jur, Public Funds §§ 57, 60, 80.
[7]  11 Am Jur, Constitutional Law § 18.
[8]  11 Am Jur, Constitutional Law § 128.
[9]  11 Am Jur, Constitutional Law §§ 193, 194.
[10]  11 Am Jur, Constitutional Law § 92.
[11]  11 Am Jur, Constitutional Law § 138.
[12]  11 Am Jur, Constitutional Law § 44.
[13]  51 Am Jur, Taxation § 113.
[15]  14 Am Jur, Costs §§ 35, 37.

ritory to city for use as part of new site for courthouse were void because they did not conform to pertinent statutory provision in that county employees residing at county infirmary and juvenile home therein had not participated in election on matter of annexation although registered as voters and required, by their employment, to live at the institutions *held*, not erroneous (Const 1908, art 3, § 2; CL 1948, § 45.16; CL 1948 and CLS 1956, § 117.1 *et seq.*).

5. WORDS AND PHRASES—CONSTRUCTION OF STATUTES—RAISE—TAXATION.

The words "raise," "raised," and "raising," when used in statutes relative to providing funds for public uses, are always associated with the subject of taxation.

6. MUNICIPAL CORPORATIONS—COURTHOUSE—BOARD OF SUPERVISORS—SURPLUS FUNDS NOT RAISED BY DIRECT TAXATION.

A county board of supervisors has the right to use surplus funds accumulated from sources other than direct taxation for the construction of a courthouse (Const 1908, art 8, § 10; CL 1948, § 141.76; CLS 1956, §§ 46.7, 141.261–141.263; CL 1948, § 141.61a, as amended by PA 1957, No 186).

7. CONSTITUTIONAL LAW—LEGISLATIVE POWER OF PEOPLE.

The legislative power of the people through their agent, the legislature, is limited only by the Constitution, which is not a grant of power but a limitation on the exercise of power.

8. STATUTES—PRESUMPTION OF CONSTITUTIONALITY.

The Supreme Court will not declare a statute unconstitutional unless it is plain that it violates some provision of the Constitution and the constitutionality of the act will be supported by all possible presumptions not clearly inconsistent with the language and the subject matter.

9. CONSTITUTIONAL LAW—LEGISLATURE.

The State legislature is the repository of all legislative power subject only to limitations and restrictions imposed by the State or Federal Constitutions.

10. STATUTES—CONSTITUTIONALITY.

It is necessary to point out in the Constitution the limitation which has been placed by the people through the Constitution upon the power of the legislature to act before the Supreme Court will declare an enactment unconstitutional.

11. SAME—CONSTITUTIONAL LAW—WISDOM OF LEGISLATION.

The advisability or wisdom of statutory enactments which are not violative of the constitutional provisions is a matter for legislative consideration and not for the Supreme Court.

12. CONSTITUTIONAL LAW—ECONOMIC CONDITIONS.

 Economic conditions may not be given the effect of modifying the fundamental law of the State.

13. SAME—TAX-LIMITATION PROVISIONS—EVASION.

 Attempts to evade the tax-limitation provisions in the Constitution by subterfuge are universally frowned upon even though the motive for doing so is worthy.

14. COUNTIES—PUBLIC BUILDINGS—BOARD OF SUPERVISORS—SURPLUS FUNDS—TAXATION—APPROVAL OF ELECTORS.

 A county board of supervisors may use surplus funds accumulated from sources other than direct taxation for the construction of public buildings but moneys derived from direct taxation may not be used for such purpose beyond the limit prescribed by the Constitution except as the electors of the county approve the same (Const 1908, art 3, § 2; CL 1948, § 45.16; CL 1948 and CLS 1956, § 117.1 *et seq.*).

15. COSTS—PUBLIC QUESTION—COURTHOUSES.

 No costs are allowed in suit wherein question is raised as to validity of action of county board of supervisors in selection of new site for county courthouse, financing construction and annexation of site to city, a public question being involved.

Appeal from Oakland; Dehnke (Herman), J., presiding. Submitted October 16, 1958. (Docket No. 70, Calendar No. 47,561.) Decided February 19, 1959.

Bill by Oakland County Taxpayers' League, a voluntary association, against the Board of Supervisors of Oakland County and the Board of Auditors of Oakland County to enjoin relocation of county courthouse, to enjoin use of accumulated annual budget surpluses as building improvement fund, and for other relief. Attorney General for the State of Michigan intervenes as party plaintiff. South Oakland County Bar Association intervenes as party defendant. Decree granting partial relief. Defendant county boards appeal. Plaintiff cross-appeals. Affirmed in part, reversed in part and remanded.

*Glenn C. Gillespie* and *William H. Wilmot,* for plaintiff.

*Paul L. Adams,* Attorney General, *Samuel J. Torina,* Solicitor General, and *James R. Ramsey,* Assistant Attorney General, for intervening plaintiff State of Michigan.

*Harry J. Merritt,* Corporation Counsel, and *Charles A. Davis,* Assistant Corporation Counsel (*Claude H. Stevens,* of counsel), for defendants.

*Allan G. Hertler,* for intervening defendant South Oakland County Bar Association.

KELLY, J. The Oakland county board of supervisors decided on a site and commenced plans for the construction of a new and adequate courthouse. No one challenges the fact that a new courthouse was necessary.

Plaintiff, a voluntary, nonpartisan association of taxpayers and electors of Oakland county, filed its bill of complaint asking the court to decree:

"A. That no authority is conferred by law upon defendant board of supervisors to designate a new site for a courthouse in Oakland county.   *   *   *

"B. That defendant board of supervisors has no lawful authority to designate a site for a new courthouse partly within and partly without the limits of the county seat.

"C. That amounts in excess of constitutional and statutory limitations for the purchase of land and the construction of public buildings without the approval of the electors, have been heretofore included by defendants in various county budgets.

"D. That defendants have made transfers of excess balances in various county funds to building funds without authority of law.

"E. That a public accounting be directed, and, upon the conclusion thereof, defendants be directed to replace and restore to the general fund of the county all moneys deposited in, or, credited to, any building account fund, or fund for the purchase of land, and any additional funds which should be deposited in or credited to the general fund as required by law."

In its bill of complaint, plaintiff does not by this action impugn the personal honesty or integrity of the members of defendant board, but does question any legal authority for their official action.

An extensive hearing was held and Hon. Herman Dehnke, circuit judge sitting in Oakland county, ruled: (1) That the county had the right to sell the old courthouse and to move the site without a vote of the people; (2) that the annexation was unlawful; and (3) that the moneys belonging to the general fund were unlawfully placed in the building fund.

Defendant, board of supervisors, and defendant-intervenor, South Oakland County Bar Association, appealed from the ruling that the annexation was unlawful and that moneys belonging to the general fund were unlawfully placed in the building fund.

Plaintiff, appellee and cross appellant asks this Court to reverse the trial court's finding that the board of supervisors had authority to determine a new site for the courthouse and to sell land donated to the county as a site for a courthouse.

The attorney general, as plaintiff-intervenor* and appellee, files a brief stating that the people are only concerned with the following problems: (1) Does article 8, section 10, of the Michigan Constitution (1908), which limits raising of money by taxation or borrowing, for the construction or repair of public buildings or bridges to 1/10 of a mill also

---

* See CL 1948, §§ 14.28, 14.101 (Stat Ann 1952 Rev §§ 3.181, 3.211).—REPORTER.

limit the amount that can be spent or accumulated from sources that properly should be used to reduce the tax revenue; and (2) are PA 1943, No 177, as last amended by PA 1956, No 136 (CL 1948 and CLS 1956, § 141.261 *et seq.* [Stat Ann 1958 Rev § 5.2770 (1) *et seq.*]), and PA 1923, No 118, as last amended by PA 1957, No 186 (CL 1948, § 141.61 *et seq.*, as amended [Stat Ann 1958 Rev § 5.2251 *et seq.*]), unconstitutional?

Question No. 1: *Did the Court err in determining that the board of supervisors had authority to select a new site?*

The site upon which the present courthouse stands was donated to the county in 1823 on condition that a courthouse be erected thereon, and a courthouse has been continuously maintained there for 135 years since the 1823 donation. The new site selected by the board is 2.7 miles from the present courthouse site.

PA 1851, No 156, § 11,[*] gave to boards of supervisors the right "to purchase any real estate necessary for the site of any courthouse," and also gave the right "to fix upon and determine the site of any such building, if not previously located." Appellee contends that the words "not previously located" are words of limitation.

The legislature did not establish the site of the present courthouse in Pontiac, Oakland county, Michigan. In deciding that the board of supervisors had the right to select a new site without a vote of the people, we adopt the opinion of the trial court:

"It must be remembered that this statute was enacted during the period when our counties were being organized by legislative action. In many cases, only general designations were made for the location of

[*] PA 1851, No 156, § 11, as amended (CLS 1956, § 46.11 [Stat Ann 1957 Cum Supp § 5.331]).

county seats, in others the precise descriptions of the site within the county seat were stated.   \* \* \* In the light of this historical background, it appears to me to be reasonable to construe section 'third' of the statutes ('to fix upon and determine the site of any such building, if not previously located') as having no other purpose than to confer upon the board of supervisors authority to establish within the boundaries of the county seat the precise site of the courthouse in those cases in which that site had not been previously fixed by the legislature."

Question No. 2: *Did the court err in deciding the board had the right to sell the present courthouse and use the proceeds to assist in financing the cost of a new courthouse?*

Revised Statutes 1846, ch 13, § 5 (CL 1948, § 45.5 [Stat Ann § 5.285]), provides:

"The board of supervisors of each county, or other public officers having the charge and management of the county lands, may, by their order of record, appoint 1 or more agents to sell any real estate of their county not donated for any special purpose, and all deeds, made on behalf of such county, by such agents under their proper hands and seals, and duly acknowledged by them, shall be sufficient to convey all the right, title, interest and estate which the county may then have in and to the land so conveyed."

Five years later the legislature by PA 1851, No 156, § 11 (CLS 1956, § 46.11, subd 4 [Stat Ann 1957 Cum Supp § 5.331, subd 4]), provided that the boards of supervisors could "authorize the sale or leasing of any real estate belonging to such county, and to prescribe the mode in which the conveyance thereof be executed."

Appellee states:

"The wisdom of the legislature in withholding power from boards of supervisors to sell real estate

donated to the county for a special purpose is apparent. Its purpose was to encourage public minded persons to donate real estate to counties, and, to permit the donor to specify in the conveyance the purpose for which it was to be used, with the assurance that the property could not be subsequently sold by county authorities and the public deprived of the use of the property specified by the donor."

One hundred and thirty-five years ago, when a public spirited citizen made his donation of land, Oakland county's needs were vastly different than today. The donor's intention to help provide for an adequate courthouse will not be violated by the sale of the property and the investment of the moneys received in a new and adequate courthouse.

Appellant, appellee, and our research, find no decision of this Court challenging the board's right under conditions similar to this case, during the more than 100 years that have elapsed since the 1846 and 1851 enactments. We do not interpret the 1846 statute, especially because of the later act of 1851, to mean that irrespective of change in social and economic needs a donor's expressed desires should never be thwarted. We agree with the trial court that the board of supervisors had the right to sell the land and building now used for courthouse purposes.

Question No. 3: *Was the annexation unlawful?*

The site selected by the board of supervisors for the new courthouse was partly within the county seat and partly within the adjacent township of Waterford. The board deemed it necessary to secure the annexation of the township property to meet the requirements of the statute (CL 1948, § 45.16 [Stat Ann § 5.291]).

The county petitioned Waterford township to detach and the city of Pontiac to annex and appropriate resolutions were passed by both bodies, as re-

quired by PA 1909, No 279, as amended (CL 1948 and CLS 1956, § 117.1 *et seq.* [Stat Ann 1949 Rev and Stat Ann 1957 Cum Supp § 5.2071 *et seq.*]), and the property was annexed to the county seat and the city of Pontiac placed as "exempt" the property on its tax record.

Section 9 of the home-rule act (CLS 1954, § 117.9 [Stat Ann 1955 Cum Supp § 5.2088]) provided:

"That as an alternate method, where there are no qualified electors residing in the territory proposed to be annexed to said city, a petition signed by \* \* \* the State or any of its subdivisions who collectively hold the record legal title to more than 1/2 of the area of the land in the territory to be annexed is filed with the city council of said city and with the township board of the township in which such territory is situated, such annexation may be accomplished by the affirmative majority vote of the city council of such city and the approval of the township board of such township."

The petition for annexation stated that "there are no qualified electors residing in the territory proposed to be annexed," and the resolutions of the township and city were based on this premise.

In the proposed annexed territory there is located an infirmary and a juvenile home, with a combined number of 14 employees, who, because of the nature of their employment, are required to live in the infirmary or the juvenile home. Several of these persons had registered as voters in Waterford township, giving their residence as either the infirmary or the juvenile home, and the trial court held that these persons should have been given the opportunity to vote on the annexation issue. Appellants take the contra position.

Article 3, § 2, of the Michigan Constitution (1908), reads:

"No elector shall be deemed to have gained or lost a residence by reason of his being employed in the service of the United States or of this State, nor while engaged in the navigation of the waters of this State or of the United States or of the high seas, nor while a student at any institution of learning, nor while kept at any almshouse or other asylum at public expense, nor while confined in any public prison; except that honorably discharged soldiers, seamen and marines who have served in the military or naval forces of the United States or of this State and who reside in soldiers' homes established by this State may acquire a residence where such home is located."

Appellants call attention to this Court's decisions to the effect that inmates of an asylum or a soldiers' home do not lose legal residence they had when they entered these institutions. See *Wolcott* v. *Holcomb,* 97 Mich 361 (23 LRA 215); *People* v. *Hanna,* 98 Mich 515. Appellee answers by stating:

"We never contended any such inmates had a right to vote, none voted so far as the record disclosed, and, this question is not involved.

"The only question to be considered under this head is whether employees of the county, who were required by their employment to live at the county infirmary or the juvenile home, who had no other place of residence and who had been regularly registered and voted in the township, were qualified electors."

Appellants set forth at length the opinion of the Colorado supreme court in *Kemp* v. *Heebner,* 77 Colo 177 (234 P 1068), where a constitutional provision similar to our Michigan provision was interpreted, and where the vote of a civilian employee of a United States soldiers' hospital was challenged. In this hospital the employees were permitted by the management, as part of their pay, to remain on the

grounds and sleep in the buildings. The court in this Colorado case held (pp 180, 182):

"We do not see any difference in principle, so far as concerns the question before us, between civilian employees and inmates. But if there is any distinction, the status of the latter is stronger and their right to vote at a place which was established solely for their benefit is much more appealing than that of the former. * * * Neither patients nor inmates nor employees of the hospital, under our Constitution and controlling statutes, would or could acquire on the hospital grounds a home or domicile, a place of permanent residence."

Appellants state:

"After diligent search appellants are unable to point to Michigan law on this question but the State of Colorado has ruled on it and its constitutional provision is very similar to ours."

It is appellants' claim that the word "State" as it appears in article 3, section 2, of the Michigan Constitution, includes "counties" and, therefore, would have the same application to county employees as it would to a State employee.

Testimony was offered by one of the county employees living at the infirmary that she had been employed there since 1936 and had made her home at the infirmary since 1943, living there by virtue of her employment and that she had registered and voted in Waterford township since 1944. Counsel agreed that substantially the same facts applied to the other county employees living at the building.

The court aptly stated:

"It is one thing to say that no presumption of a legal right to vote arises from the fact that persons coming within any of such special classes are abiding in the township or city, voluntarily or involuntarily; it is something very different to say that em-

.ployment of the kind here under consideration in and of itself is a legal bar to acquiring the status of 'legal elector' within the municipality."

The legal voting status of these employees had not been challenged in previous elections. Those who were conducting the annexation proceedings undoubtedly failed to realize that within the annexed territory there were qualified electors. After the legality of the proceedings had been challenged a second petition was filed by the supervisors with signatures of those persons whose voting status is now in dispute, and this petition stated that they were "qualified electors."

The court did not err in holding that "these proceedings, not conforming to the special conditions of the statute, were void and ineffective. From a practical standpoint, I do not suppose that this constitutes a serious obstacle to carrying out defendants' plans, but it does mean that some other method must be pursued to accomplish the annexation."

Question No. 4: *"Does article 8, § 10, of the Michigan Constitution (1908), which limits raising of money by taxation or borrowing 'for the construction or repair of public buildings or bridges' to 1/10 of a mill, also limit the amount that can be spent or accumulated from sources other than direct taxation?"*

August 3, 1954, a special election, pursuant to a resolution of the board of supervisors, was held and the following proposals were submitted:

1. Shall the county borrow $4,500,000 to pay the cost of erecting a county building in the city of Pontiac to house the courts and general county offices?

2. Shall the limitation on the total amount of taxes be increased by 1/20 of 1% for the purpose of paying principal and interest on bonds to pay the cost of erecting a county building in the city of Pontiac, Michigan, to house the courts and county offices?

Oakland county voters approved the bond issue, but defeated the increase of millage.

The board again submitted the question of increasing the millage at the general election of November 2, 1954, but again the millage proposal was defeated.

The board considered the creation of a county authority and a revenue bond issue but, on advice of the county financial expert, abandoned the plan.

The board of supervisors then decided to proceed toward the construction of the courthouse, using the balance in the building fund, allocating to the building fund miscellaneous county revenues, and continuing the 1/10 mill property tax, and the board employed an architect. The county's plan of financing is described by appellant county as "a pay-as-you-go, piecemeal plan which would be financed with the surpluses on hand plus current receipts." This plan, however, was brought to a halt on the 20th day of November, 1956, when appellee instituted this action.

During the past 10 years, out of an appropriated surplus on hand, the board of supervisors has erected the following county buildings: an addition to the infirmary, 2 juvenile cottages, an office building, social service building, medical center, dog pound, a market, and a children's clinic, at a cost of $2,192,-716.70. Appellee admits all of these buildings were necessary.

During this 10-year period only $528,303.70 was derived from the 1/10 mill tax, and the board of supervisors met the needed moneys, approximately 1-1/2 million dollars, by using the unexpended balance that remained at the end of each year. Appellee claims this financial plan does not change the fact that it was derived from taxation; that continued annual underestimate of miscellaneous revenue was to increase the county tax levy by the amount of the annual surplus; that the surplus mis-

cellaneous revenues could not be expended by the board without authority of the electors.

Defendant board informed the trial court that, "Most, if not all, of the differences between the parties to this suit involves legal interpretations of the Constitution and the statutes.* * * May we respectfully suggest that in tilling the legal soil in this case the court will have its plow in some virgin soil."

The attorney general, calling to the trial court's attention the auditor general's duty toward counties, stated: "Involved is the question of financial morality."

Article 8, section 10, of the Constitution (1908), reads:

"The board of supervisors of any county may in any 1 year levy a tax of 1/10 of 1 mill on the assessed valuation of said county for the construction or repair of public buildings or bridges, or may borrow an equal sum for such purposes; * * * but no greater sum shall be raised for such purposes in any county in any 1 year, unless submitted to the electors of the county and approved by a majority of those voting thereon."

Similar limitations are found in the statutes. CLS 1956, § 46.7 (Stat Ann 1957 Cum Supp § 5.327) provides:

"The board of supervisors of any county may in any 1 year levy a tax of 1/10 of 1 mill on the assessed valuation of said county for the construction or repair of public buildings * * * but no greater sum shall be raised for such purposes in any county in any 1 year, unless submitted to the electors of the county and approved by a majority of those voting thereon."

CL 1948, § 141.71 (Stat Ann 1958 Rev § 5.2301) provides:

"The board of supervisors of any county may in any 1 year levy a tax of 1/10 of 1 mill on the assessed valuation of said county for purchase of real estate for sites for, and the construction or repair of public buildings or bridges, or may borrow an equivalent sum for such purpose; * * * but no greater sum shall be raised for such purpose in any county in any 1 year unless submitted to the electors of the county and approved by a majority of those voting thereon in the manner provided in this act."

Appellants, endeavoring to justify the use of funds accumulated from sources other than direct taxation, contend that the word "raised" as used in article 8, section 10, of the Constitution, means "raised by taxation," and cites from 36 Words & Phrases, p 79, as follows:

"Words 'to raise money,' as applied to municipality, commonly mean to raise by taxation. *Dowling* v. *Board of Assessors of City of Boston,* 268 Mass 480, 484 (168 NE 73, 75)."

Appellants also call attention to decisions of this Court in *Board of Supervisors of Dickinson County* v. *Warren,* 98 Mich 144; and *Sebewaing Industries, Inc.,* v. *Village of Sebewaing,* 337 Mich 530.

*Board of Supervisors of Dickinson County* v. *Warren, supra,* involved the construction of a statute (How Stat § 483*) and in holding that a board of supervisors has no power to borrow money to defray current expenses and charges of the county, this Court stated: (pp 146, 147):

"The words 'raise,' 'raised,' and 'raising' occur frequently in our statutes relative to providing the necessary funds for public uses, and in that connection they are always associated with the subject of taxation.   Not only do the phrases 'raised by tax,'

---

* Section 11. Currently CLS 1956, § 46.11 (Stat Ann 1957 Cum Supp § 5.331).—REPORTER.

'raise annually by taxation,' 'all taxes raised,' and similar clauses, appear times without number, but the word 'raise,' without qualifying words, is frequently employed in grants of authority to provide the necessary funds for public use in cases where the intent to prescribe the method in which the power is to be exercised, *viz.*, by taxation, is so clearly obvious that the word may be said to have acquired a clearly defined meaning when used in that connection. We are of opinion, therefore, that when the legislature made special provision for 'the raising of any money which may be necessary to defray the current expenses and charges of said county,' it was the intention to except such purposes from the operation of subdivision 7, and provide that the necessary funds for this class of expenses should be raised by taxation. We find further warrant in arriving at this conclusion in the fact that this is the construction which, in practice, this subdivision has received since its adoption in 1859."

In the *Sebewaing Appeal, supra,* this Court construed the provision of the general village act providing the council may raise and expend such sums as they deem advisable for repairing, altering or extending the village lighting works, and stated (p 542):

"The words 'the council may then raise and expend * * * such sum as it may deem advisable' make obvious the legislative intent that the sum thereby authorized to be 'expended' is a sum which is to be 'raised,' and the entire section makes manifest that the word 'raise,' as therein used, means the levying of a tax."

Appellants contend that neither article 8, section 10, nor any other section, of the Constitution places any limitation upon the expenditure of miscellaneous or nontax derived revenues, and, therefore, the legislature had the right to provide for use of said funds for county building and that the legislature so pro-

vided by PA 1943, No 177, as last amended by PA 1956, No 136, and, also, by PA 1923, No 118, as amended by PA 1957, No 186.

PA 1923, No 118, § 1a, as amended (CL 1948, § 141.61a, as amended [Stat Ann 1958 Rev § 5.2251 (1)]), provides:

"The board of supervisors without submitting the same to the vote of the electors shall have the right or power to authorize annually the expenditure from any funds on hand not raised by taxation a sum not in excess of 1 mill of the assessed valuation of the county for the purpose of constructing, equipping or making alterations in any of the public buildings in the county if said board of supervisors shall by resolution of a majority of the total membership of said board authorize the same: Provided, That no such moneys shall be expended without the vote of the people if said moneys are to be raised by taxation."

Sections 1, 2 and 3 of PA 1943, No 177, as amended, provide:

"Sec. 1. The legislative or governing body of any political subdivision is hereby authorized and empowered to create and establish a fund or funds for the purpose of appropriating, providing for, setting aside and accumulating moneys to be used for acquiring, constructing, extending, altering, repairing or equipping public improvements or public buildings, which said political subdivision may by the provisions of its charter or the general law be authorized to acquire, construct, extend, alter, enlarge, equip or repair." (CLS 1956, § 141.261 [Stat Ann 1958 Rev § 5.2770(1)].)

"Sec. 2. Notwithstanding the provisions of any law or the charter of any city or village, moneys accumulated in said fund shall not be transferred, encumbered or otherwise disposed of, except for the purpose of acquiring, constructing, extending, al-

tering, repairing or equipping public improvements or public buildings, which a political subdivison may by the provisions of its charter or the general law be authorized to acquire, construct, extend, alter, repair or equip. Funds established and moneys on hand which had been allocated to or appropriated for the making of capital improvements on January 1, 1956, may be transferred to or credited to such reserve fund created under authority of this act and when so transferred or credited shall be governed by the provisions of this act." (CLS 1956, § 141.262 [Stat Ann 1958 Rev § 5.2770(2)].)

"Sec. 3. The legislative or governing body of any political subdivision may allocate to said fund miscellaneous revenues received and credited to the general fund, including revenues received by said political subdivision under the provisions of Act No 155 of the Public Acts of 1937, as amended, being sections 211.351 to 211.364, inclusive, of the Compiled Laws of 1948, and also revenues received from the sale of lands owned by the political subdivision and which are no longer needed for public purposes, if said revenues are not otherwise pledged or encumbered for other purposes." (CLS 1956, § 141.263 [Stat Ann 1958 Rev § 5.2770(3)].)

Some portion of these transferred funds came from surpluses in other tax-raised brackets, but the great bulk of these miscellaneous receipts consisted of the statutory fees paid to the county clerk, treasurer, register of deeds, sheriff, probate and circuit courts, and receipts of other county departments or activities, including children's center, contagious hospital and juvenile home, all in very substantial amounts.

Ruling that defendants could not use the surplus funds for building purposes, the trial judge stated that, in spite of the fact that the 1957 amendment was passed by our legislature at the request and instigation of Oakland county officials, he would not

read into the enactment the interpretation asked for by appellants.

We disagree with the trial court's conclusion in this regard and hold that the legislature has given to Oakland county's board of supervisors the right to use the accumulated surplus for building purposes.

The main question, therefore, centers down to this: Did the legislature have the constitutional right to grant this power to the board of supervisors?

In the early case of *Attorney General* v. *Preston* (January, 1885), 56 Mich 177, this Court established that the legislative power of the people through their agent, the legislature, is limited only by the Constitution, which is not a grant of power, but a limitation on the exercise of power; and, secondly, that this Court will not declare a statute unconstitutional unless it is plain that it violates some provisions of the Constitution and the constitutionality of the act will be supported by all possible presumptions not clearly inconsistent with the language and the subject matter.

In *Huron-Clinton Metropolitan Authority* v. *Boards of Supervisors of Five Counties,* 300 Mich 1, we stated: (1) That the State legislature is the repository of all legislative power subject only to limitations and restrictions imposed by the State or Federal Constitutions, as constitutional provisions are to be regarded as limitations on State legislatures and not a grant of power to them; (2) That in passing upon the constitutionality of State legislation, it is necessary to point out in the Constitution of the State the limitations which have been placed by the people through the Constitution upon the power of the legislature to act, before our Court will declare the enactment unconstitutional; (3) That the advisability or wisdom of statutory enactments, which are not violative of the constitutional pro-

visions, is a matter for legislative consideration and not for this Court.

Do the words of article 8, section 10, of the State Constitution (1908), authorizing the board of supervisors to in any 1 year levy a tax of 1/10 of 1 mill for the construction or repair of public buildings, prevent the legislature from enacting that the board, without submitting the same to a vote of the electors, has the right and power to authorize annually the expenditure from any funds on hand not raised by taxation a sum not in excess of 1 mill of the assessed valuation of the county for the purpose of constructing public buildings, and that the board is authorized and empowered to create and establish a fund for setting aside and accumulating moneys to be used for acquiring, constructing, extending, altering and repairing public buildings?

This question has been presented to this Court for the first time. We agree with Judge Dehnke that our opinion will have far-reaching results for other counties besides Oakland. We set forth the following paragraph from his opinion:

"The problem is one that has become acute because of the pressure from every side for appropriations to support numberless good causes out of limited funds, and pressure from other directions to keep tax burdens within reason. But we must reckon also with the human tendency which sometimes causes public officials, confident that their own means of information and judgment are superior, to come to look upon legal and constitutional limitations on official power, such as having to ask the voters for specific authorization or approval, as irksome shackles, tending only to impede the efficient administration of public business, which should therefore be ignored so far as possible, and must otherwise be endured with as much patience and forbearance as can be mustered. Nothing said in this opinion should be construed as

reflecting on the motive and intentions of defendant boards. What the case turns on is the question of authority—were the actions complained of within the limits of legal and constitutional powers."

Numerous decisions have safeguarded the Constitution against those who ignored its provisions on the grounds of necessity and expediency, and among such decisions are 2 which have been decided since the writer of this opinion became a member of this Court 5 years ago, and which we now cite with complete approval. In *Michigan Savings & Loan League* v. *Municipal Finance Commission,* 347 Mich 311, it was decided that economic conditions may not be given the effect of modifying the fundamental law of the State; and in *Bacon* v. *Kent-Ottawa Metropolitan Water Authority,* 354 Mich 159, it was held that attempts to evade the tax-limitation provisions in the Constitution by subterfuge are universally frowned upon even though the motive for doing so is worthy.

Applying principles from the earliest decision to the latest, we conclude that there is no constitutional inhibition preventing the legislature from allowing the board of supervisors to use the surplus accumulated from what the trial court aptly described as "miscellaneous receipts." However, moneys cannot be used for building purposes which were raised or accumulated through direct taxation beyond the 1/10 of 1 mill constitutional limitation and we, therefore, order that the board refrain from using any of said funds for the contemplated purpose of building the courthouse.

Over 2 years have elapsed since the Oakland county taxpayers stopped the board of supervisors' endeavors to construct a very necessary courthouse to meet the executive and legislative needs of the county. Less than 3 months of that time have passed

since this question was first brought to this Court and the writing of this opinion.

Judge Dehnke's observation that few cases have been conducted with greater diligence or honesty by opposing counsel, is shared by this Court. Therefore, in remanding to Judge Dehnke certain modifications of his decree, we do not feel there will be too great a difficulty in effecting our decision, namely: (1) The board had the right to designate a new courthouse site; (2) The board had the right to sell the old courthouse; (3) The board failed to meet statutory requirements in its annexation proceedings; (4) The board had the right to use for building purposes miscellaneous funds as contradistinguished from funds raised by direct taxation beyond the 1/10 of 1 mill limitation.

In carrying forward this decision, if difficulty is encountered between plaintiff and defendants, such difficulty shall be presented to Judge Dehnke for his final decision and any appeal from his decision will be reconsidered by this Court on a typewritten record, certified to by Judge Dehnke, and upon typewritten briefs by plaintiff and defendants.

Reversed in part and affirmed in part. No costs, a public question being involved.

DETHMERS, C. J., and CARR, and EDWARDS, JJ., concurred with KELLY, J.

BLACK, J. (*concurring in part*). I concur with Mr. Justice KELLY save only as to his treatment of what we refer to as question No. 4. That question is: *"Does article 8, § 10, of the Michigan Constitution (1908), which limits raising of money by taxation or borrowing, 'for the construction or repair of public buildings or bridges,' to 1/10 of a mill, also limit the amount that can be spent or accumulated from sources other than direct taxation?"*

In 1945 the prosecuting attorney of Washtenaw county inquired of then attorney general and now Chief Justice DETHMERS whether the Washtenaw board of supervisors "could set up a building fund for a courthouse in advance by means of allocating fees paid to various county officers to a so-called building fund." The attorney general answered in the negative (OAG, 1945–1946, 305; supplemental opinion OAG, 1945–1946, 326).

The chancellor below, relying, in part, on the mentioned opinion and, in part, on his own painstaking research, held (a) that the legislature "has been persistently pressed to widen the authorizations to the point that it might be plausibly claimed that surpluses and operational receipts were to be considered 'miscellaneous revenues' and available for transfers to sinking or building funds, in addition to the permitted 1/10th mill;" (b) that the legislature has "consistently refused to yield to that pressure," and (c) that any contrary interpretation of the statutes in question (see Mr. Justice KELLY's opinion for citation and quotation) would result in offense to article 8, § 10, Const 1908.

I agree with the chancellor and adopt his summational reasoning as follows:

"Cutting, as we are in duty bound to do, through all masks and veneers, and relying on what is implicit in the constitutional limitation itself, I am persuaded that these accumulations around which the case turns, whether called surpluses, other available funds, or something else, *have, in fact and in substance, been raised by taxation*—they consist of moneys which it would not have been necessary to levy, assess and collect from taxpayers if the surpluses had been carried over into succeeding years, and if the budget estimates and tax levies had been limited to the amount reasonably required *over and*

*above money on hand,* and *over and above acceptably accurate estimates of prospective income.**

"It is a fundamental rule of statutory construction that legislative enactments are not to be held unconstitutional unless their terms cannot be reasonably interpreted in any other way except to bring them into conflict with some provision of the Constitution; or, to put it another way, they must be construed, if reasonably possible, in such a way as to avoid such conflict. Measured by this test, it is my conclusion that the statutes in question can be reasonably interpreted as not including within their terms authorization to transfer to building funds such items as the surpluses and operational revenues here involved; and that, so interpreted, they are not unconstitutional."

I would affirm the decree below in its entirety, without costs to any party.

Smith and Voelker, JJ., concurred with Black, J.

Kavanagh, J., did not sit.

---

* The emphasis is that of the chancellor.