BOOTH NEWSPAPERS, INC v UNIVERSITY OF MICHIGAN
BOARD OF REGENTS

Docket Nos. 120478, 120543. Submitted March 20, 1991, at Lansing.
Decided January 21, 1992, at 10:15 A.M. Leave to appeal sought.

Booth Newspapers, Inc., and the Detroit Free Press, Inc., brought
an action in the Washtenaw Circuit Court against the Univer-
sity of Michigan Board of Regents, seeking declaratory and
injunctive relief and alleging that the board violated the Open
Meetings Act, MCL 15.261 *et seq.*; MSA 4.1800(11) *et seq.*, in
screening applicants for the position of university president
when it divided itself into committees comprised of less than a
quorum of the entire board to avoid having to conduct public
meetings, and that the board violated the Freedom of Informa-
tion Act, MCL 15.231 *et seq.*; MSA 4.1801(1) *et seq.*, in refusing
to disclose the various localities to which the regents traveled
in order to interview applicants. The court, Ross W. Campbell,
J., granted summary disposition for the board, ruling that the
process of selecting a public university president is a sensitive
undertaking that should not be subjected to the restrictions of
the Open Meetings Act and the Freedom of Information Act.

The Court of Appeals *held:*

1. The Open Meetings Act, whose purpose is to promote
openness and accountability in government, requires that all
meetings of a public body be open to the public, MCL 15.263(1);
MSA 4.1800(130(1), and defines "meeting" as the convening of a
public body at which a quorum is present to deliberate or
render a decision on a public policy, MCL 15.262(b); MSA
4.1800(12)(b). The act applies to subquorum meetings of a public
body where, as in this case, the public body deliberately divided
itself into groups of less than a quorum to directly circumvent
the act.

2. The closed meetings of the board did not come within the
exception allowed under the Open Meetings Act for closed
sessions to review the specific contents of an application for

REFERENCES

Am Jur 2d, Administrative Law § 229.
Validity, construction, and application of statutes making public
proceedings open to public. 38 ALR3d 1070.

employment or appointment to a public office if the candidate requests confidentiality. MCL 15.268(f); MSA 4.1800(18)(f). The exception does not apply because the initial meetings were held before any candidate requested confidentiality, and the board actually did more than review the contents of the candidates' applications once confidentiality was requested. Because § 8(f) requires that all interviews be held at an open meeting, the board violated § 8(f) to the extent that it conducted interviews in closed session. In the future, the board should not use the procedures employed in this case.

3. The trial court did not err in ruling that the plaintiffs' request for disclosure of the localities at which interviews were conducted was subject to the exemption provided by the Freedom of Information Act for information of a personal nature whose public disclosure would constitute a clearly unwarranted invasion of an individual's privacy. MCL 15.243(1)(a); MSA 4.1801(130(1)(a). All the candidates under final consideration had requested confidentiality, and disclosure of the localities, with minimal investigation, would have revealed those candidates' identities.

4. The plaintiffs are entitled to an award of attorney fees and costs pursuant to the Open Meetings Act, MCL 15.271(4); MSA 4.1800(210(4), requiring remand for the limited purpose of making such an award.

Affirmed in part, reversed in part, and remanded.

G. S. Allen, J., concurring, stated that the board did not act in bad faith or intend to circumvent directly the Open Meetings Act and that the Legislature should consider whether the screening process for applicants for the presidency of a public college or university should be exempt from the requirements of the act.

Statutes — Open Meetings Act — Meetings.

The Open Meetings Act requires that meetings of a public body at which a quorum is present to deliberate matters of public policy must be held in public; a public body may not conduct meetings with less than a quorum where the intent is to circumvent deliberately the objective of promoting openness and accountability in government (MCL 15.261 et seq.; MSA 4.1800[11]).

*Dykema Gossett* (by *E. Edward Hood* and *Jonathan D. Rowe*), for Booth Newspapers, Inc.

*Honigman Miller Schwartz & Cohn* (by *Herschel*

*P. Fink* and *Michael A. Gruskin*), for Detroit Free Press, Inc.

*Hooper, Hathaway, Price, Beuche & Wallace* (by *Roderick K. Daane*), for University of Michigan Board of Regents.

Before: Hood, P.J., and Jansen and G. S. Allen,* JJ.

Jansen, J. Booth Newspapers, Inc., doing business as The Ann Arbor News, and The Detroit Free Press, Inc., brought suit against the Board of Regents of the University of Michigan, alleging violations by defendant of the Open Meetings Act (oma), MCL 15.261 *et seq.*; MSA 4.1800(11) *et seq.,* and the Freedom of Information Act (foia), MCL 15.231 *et seq.*; MSA 4.1801(1) *et seq.* Plaintiffs sought both declaratory and injunctive relief against the procedures employed by the board in selecting the current president of the University of Michigan. All relief requested by plaintiffs was denied by the trial court, and summary disposition was granted in favor of defendant. Plaintiffs appeal as of right.

In April 1987, Harold Shapiro resigned as president of the University of Michigan, effective January 1988. In May 1987, the board, consisting of eight members, began the process of selecting a new president by appointing itself as the Presidential Selection Committee (psc). Regent Brown was appointed chairman of the psc, and the sole purpose of the psc was to find a new president. In addition, three advisory committees were formed to assist the psc: a faculty committee, a student committee, and an alumni committee.

* Former Court of Appeals judge, sitting on the Court of Appeals by assignment.

By the fall of 1987, a list of 250 potential candidates had been compiled, although no formal "applications" had been submitted by the candidates. Rather, most of the candidates had been recommended by third persons, who advised the PSC of the candidates' qualifications. The PSC's administrative secretary compiled a notebook of information relating to the candidates, and the board members considered the materials in the notebook to be the applications of the candidates.

A procedure utilizing a series of "cuts" was employed to narrow the list of candidates from 250 to one. The first cut reduced the number of applicants from 250 to 70. Although defendant contends that Regent Brown alone was entrusted with the authority to make the first cut, it is clear that he did so after numerous meetings between the advisory committees and subquorum groups of regents. The board avoided allowing more than five regents to be present at any one time to discuss the selection process because it otherwise would have had to conduct a public meeting under the OMA.

Brown made the cut on the basis of input from all the regents, and his decision was largely an arithmetic function rather than a matter of judgment. All the regents had an opportunity to review Brown's list of seventy candidates, and any individual regent could request that a particular candidate be retained despite Brown's decision to eliminate the candidate from consideration.

It is also important to note that, in addition to the meetings between the advisory committees and subquorum groups of regents, the input received by Brown resulted from "round the horn" telephone calls and informal subquorum gatherings of less than five regents. The acknowledged purpose of the telephone calls and subquorum meetings was to achieve the same intercommunications that

could have been achieved in a full meeting of the board.

The second cut utilized essentially the same procedure as the first cut, and the list of candidates was reduced from seventy to thirty. Again, Regent Brown engaged in telephone discussions with the other regents, and all the regents participated in the narrowing process. Subquorum-sized groups of regents met to discuss the candidates and to achieve an understanding with regard to the desired candidates. According to one regent, candidates were rated, the ratings were tallied and circulated, and Brown discussed the results privately with each of the regents to insure that the list of thirty would be acceptable to all the regents.

The third cut was made by the candidates themselves as a result of telephone calls from Brown. Brown called the candidates on the list of thirty and asked if they were interested in the position of president and in a "visit" from some of the regents. Twelve of the candidates expressed their desire to remain on the list.

In March and April 1988, Brown set up "visits" between the applicants and groups of two, three, or four regents. The visits were to take place in the candidates' home cities, and the regents were informed by the candidates that they would like their candidacy to remain confidential.

Discussions were held between the candidates and the visiting groups of regents regarding the attractiveness of the position and the candidates' qualifications and interests. Following these visits, some of the regents submitted written reports of their impressions of the candidates to the other regents. Other regents telephoned Brown with their impressions.

The fourth cut came following a series of closed

meetings held by the board to discuss the twelve candidates. The board believed that it was now able to meet in a closed session, because all twelve candidates had requested confidentiality. Brown reduced the list of candidates from twelve to five following the closed-session meetings. Although the regents contend that no voting occurred at these closed meetings, they do agree that a general consensus was reached and that Brown's list of five candidates reflected the views of the eight regents as a whole. The views of all regents were weighed to arrive at the fourth cut.

Brown next formed five interviewing committees, consisting of four regents and representatives from the faculty, student, and alumni committees. The interviews were conducted in private, and at the end of this interviewing process, all but one of the regents had personally spoken with each of the remaining candidates. The interviewers submitted reports on their views of the candidates, and those regents excluded from the interview of a particular candidate were apprised of what had occurred at the interview.

On May 20, 1988, the board resolved to form a "nominating committee" for the purpose of deciding which candidates would be placed in nomination for action by the board. On May 24, 1988, before any meeting of the nominating committee, seven of the regents held a closed meeting to discuss the results of the interviews and to make their views on each of the remaining candidates known. Although the board urges that no voting took place at this time, a consensus was reached that two of the candidates were preferred over the other three.

Immediately following this closed meeting, the nominating committee met, considered the entire list of candidates, and decided that only the two

preferred candidates would remain in consideration. This was the fifth cut. Following this decision, the nominating committee interviewed the two remaining candidates and unanimously decided to recommend one to the board. The remaining candidate, James Duderstadt, was interviewed in an open session by the regents and selected faculty, student, and alumni representatives.

After this open interview, the nominating committee met in a closed session, and thereafter recommended that Doctor Duderstadt be nominated. The board then reconvened in a public session and voted to elect Duderstadt president of the University of Michigan.

The trial court granted defendant's motion for summary disposition, holding that the OMA and the FOIA did not apply to defendant's search for a new president for the University of Michigan because of the sensitive nature of the personnel search conducted by the board. The trial court found the acts to be inapplicable, because disclosure of the identity of candidates under consideration would be deleterious and inimical to the public good in the effort being made by defendant to select the best qualified person for that position. We affirm in part and reverse in part.

The purpose of the OMA is to promote openness and accountability in government; it is therefore to be interpreted broadly to accomplish this goal. *Booth Newspapers, Inc v Wyoming City Council,* 168 Mich App 459, 466; 425 NW2d 695 (1988); *Detroit News, Inc v Detroit,* 185 Mich App 296, 300; 460 NW2d 312 (1990). Because the OMA is interpreted liberally in favor of openness, we construe the closed-session exceptions strictly to limit the situations that are not open to the public. *Wexford Co Prosecutor v Pranger,* 83 Mich App 197, 201; 268 NW2d 344 (1978); *Detroit News,* p

302; *Wyoming,* p 467. The burden of establishing that a meeting is exempt from the OMA is on defendant. *Detroit News,* p 301.

The OMA requires that all meetings of a public body be open to the public. MCL 15.263(1); MSA 4.1800(13)(1). The OMA defines a meeting as the convening of a public body at which a quorum is present to deliberate or render a decision on public policy. MCL 15.262(b); MSA 4.1800(12)(b). There is no doubt that defendant is a public body as defined in the OMA. MCL 15.262(a); MSA 4.1800(12)(a).

Defendant contends, however, that it did not violate the OMA because the subquorum activities of its various committees did not constitute a constructive quorum, and therefore, its meetings did not have to be open to the public. We disagree.

In *Wyoming, supra,* this Court noted that advisory committees of less than a quorum that do not collectively deliberate toward resolution of public business are not within the purview of the act. *Id.,* p 472. However, when such committees meet in an attempt to avoid application of the act, the OMA will apply. *Id.*

In the present case, as in *Wyoming,* the subquorum committees established by defendant engaged in telephone calls and small group meetings in an attempt to achieve the same intercommunications that could only have been achieved in a full meeting of the board. Because defendant, a public body, deliberately divided itself into subquorum groups to deliberate on public policy, in direct circumvention of the OMA's objective of promoting openness and accountability in government, we hold that the OMA applies. *Id.* The subquorum groups were utilized or designed to avoid the OMA, and therefore, they constituted a constructive quorum under *Wyoming, supra.*

Defendant next contends that the OMA does not

apply because defendant made no "decisions" throughout the selection process until President Duderstadt was elected at an open meeting. Again, we cannot agree with defendant.

The OMA requires that all decisions of a public body must be made at a meeting open to the public. MCL 15.263(2); MSA 4.1800(13)(2). A decision is defined as "a determination, action, vote, or disposition upon a motion, proposal, recommendation, resolution, order, ordinance, bill or measure on which a vote by members of a public body is required and by which a public body effectuates or formulates public policy." MCL 15.262(d); MSA 4.1800(12)(d).

Defendant argues that the decisions to reduce the candidate list were made by Brown alone and no votes were taken or decisions made until the time that President Duderstadt was elected at the final open meeting. Our review of the record leads us to the conclusion that decisions were made by the board throughout the entire search process. At each cut in the selection process, all the regents were in constant communication with each other and with Regent Brown. Although Brown is credited with having made several of the cuts on his own, he did so only after full communication with the other regents.

The regents, at each step of the way, provided significant input into the decision-making process as carried out by Brown. The board members reached a consensus with respect to which candidates were to be on the list and which was to be eventually elected president. The shortening of the candidate list consisted of an undisputed decision-making process that was carried out with the full consensus of the board. We find that these were decisions under the OMA that necessarily should have been made only at open meetings.

Defendant also argues that it was allowed to hold closed sessions pursuant to MCL 15.268(f); MSA 4.1800(18)(f). Section 8(f) allows a public body to meet in a closed session to review the specific contents of an application for employment or appointment to a public office if the candidate requests confidentiality. However, all interviews must still be conducted at an open meeting.

The problem with defendant's argument is twofold. First, defendant deliberated during the first and second cuts before any candidates requested confidentiality. The OMA provides that all deliberations of a public body constituting a quorum of its members must take place at an open meeting. MCL 15.263(3); MSA 4.1800(13)(3). Because no candidate had requested confidentiality at these early stages, defendant's deliberations were required to be conducted at open meetings.

The second problem with defendant's argument is that, after the candidates requested confidentiality, defendant did more than review the specific contents of the candidates' applications. Although the trial court held that this exception extended to all investigation and consideration of the applicants by the board, we find this holding to be overly broad.

The phrase "specific contents of an application for employment" is clear and unambiguous, and it cannot be read to include, as the trial court held, all investigation and consideration of the applicants. The purpose of this exception is not the protection of the applicants' identity, inasmuch as all interviews are required to be open to the public. The exception applies only to the review of the specific contents of the candidates' application for employment. The exception allows the public body to deliberate on the specific contents of the

application, but does not disguise the fact that an application has been made.

Furthermore, during the closed-session § 8(f) meetings, the board discussed the results of various interviews that had been conducted, along with the views of the various advisory committees. The board also considered the criteria to be used in evaluating the remaining candidates and certain names surfaced during these meetings as leading contenders. Clearly, the discussions at these closed, § 8(f) meetings went beyond the review of the specific contents of the candidates' applications. Under such circumstances, we find that the OMA was violated by defendant.

We also find that defendant violated § 8(f) to the extent that it conducted closed-session interviews. Pursuant to § 8(f), all interviews by a public body for employment or appointment to a public office must be held at an open meeting. Although defendant employs the term "visits" rather than interviews, we find no distinction on this record.

When the candidate list was reduced to twelve names, various regents visited the candidates in their home cities and discussed with them the attractiveness of the position and the candidates' qualifications. The results of these visits were shared with the other regents. When the candidate list was reduced to five names, interviewing committees were formed and closed interviews were held. When the interviewing process was completed, all but one of the regents had personally spoken with each of the remaining candidates. All the regents were apprised of what had occurred at the various interviews.

We would hold that, under such circumstances, the visits and interviews were in fact interviews by a public body under the OMA. Therefore, the

interviews should have been conducted at a meeting open to the public.

In passing, we would note that the trial court's holding created an exception to the OMA for the sensitive search for a president of the University of Michigan. While it may be that the exceptions in our statute should be broadened to permit closed sessions under such circumstances, we consider that to be a legislative matter better decided within the framework of the legislative process. *Pranger,* pp 203-204. It is not our task to pass upon the wisdom of the Legislature. *Wyoming,* p 470.

We hold that the use of overlapping, intercommunicating, subquorum committees of public bodies as a means of directly circumventing the OMA is not legal and is in direct contravention of the objective of the OMA to promote openness and accountability in government.

In addition to the above holding, we find that the trial court did not err in denying plaintiffs' request under the FOIA for travel-expense reports and vouchers covering the regents' visits to the candidates. Although defendant provided plaintiffs with copies of the expense reports, redacted therefrom were the destinations to which the regents traveled. Defendants claimed that the destinations in the expense reports were exempt from disclosure, citing MCL 15.243(1)(a); MSA 4.1801(13)(1)(a). Section 13(1)(a) exempts from disclosure information of a personal nature where public disclosure of the information "would constitute a clearly unwarranted invasion of an individual's privacy."

The trial court held that the information sought by plaintiffs regarding the regents' travel destinations was exempt from disclosure under §§ 13(1)(a) and 13(1)(d). The trial court opined that disclosure of the regents' travel destinations would, with

little further investigation, reveal the candidates' identities. Because all the candidates under final consideration had requested confidentiality, the forced disclosure of their identities would constitute an unwarranted invasion of their privacy.

Under the FOIA, a person has the right to receive, upon proper request, copies of public records not subject to exemption from disclosure. MCL 15.233(1); MSA 4.1801(3)(1). The public policy of the act, which is a disclosure statute, is to ensure that an informed public may fully participate in the democratic process. MCL 15.231(2); MSA 4.1801(1)(2); *State Employees Ass'n v Dep't of Management & Budget,* 428 Mich 104, 109; 404 NW2d 606 (1987); *Penokie v Michigan Technological University,* 93 Mich App 650, 664; 287 NW2d 304 (1979). A public body that denies a request has the burden of showing that the requested information falls within one of the act's exemptions. *State Employees Ass'n,* pp 109-110; *Penokie,* p 659. Claimed exemptions must be supported by substantial justification and explanation, not merely by conclusory assertions. *Id.*

In this case, the information sought by plaintiffs, and redacted by defendant, was the travel destinations of the regents who visited various potential candidates. Pursuant to § 13(1)(a), information of a personal nature is exempt from disclosure where public disclosure would constitute a clearly unwarranted invasion of privacy. This exemption limits nondisclosure to intimate details of a highly personal nature. *Penokie,* pp 660-663.

We agree with the trial court that disclosure of the regents' travel destinations would, with little further investigation, reveal the candidates' identities, thereby constituting a clearly unwarranted invasion of their privacy. The record in this case

clearly reveals that most of the candidates strongly felt that disclosure of their identities would constitute an unwarranted invasion of their privacy. Most of the applicants were presidents of other colleges or universities, or persons holding positions of equal responsibility, who wished to keep their identities confidential either because of fear of reprisal by their current employers or because public knowledge of nonselection would stigmatize them as having been weighed and found wanting and thereby blight their future careers as educational administrators. The record also reveals that, because of the possibility that the trial court might require disclosure of identity to plaintiffs, one of the five then remaining candidates under consideration withdrew upon learning of the present suit.

Given the undisputed facts of this case, we are unable to conclude that the trial court erred in denying plaintiffs' FOIA request. The travel destinations of the regents amount to intimate details of a nature highly personal to the candidates, which, if disclosed, would constitute a clearly unwarranted invasion of privacy. This is so because most communities hold only a limited number of individuals sufficiently qualified to be able to serve as a university or college president, particularly where the communities are relatively small and have a large university or college.

In the present case, plaintiffs sought not only the travel destination to the location of the person eventually selected, but also the locations of the remaining candidates who were subsequently eliminated from consideration. The federal court, in *Core v United States Postal Service,* 730 F2d 946, 948-949 (CA 4, 1984), declined to divulge the identities of unsuccessful job applicants, explaining that to do so would violate the federal FOIA's

exemption for a clearly unwarranted invasion of privacy.

We believe that the federal court's reasoning in *Core* was sound and that the trial court's reliance on *Core* was appropriate. Therefore, we hold that the regents' travel destinations constitute information of a personal nature and disclosure of such information would amount to a clearly unwarranted invasion of the candidates' privacy. We would also note that defendant's reliance on the exemption stated in § 13(1)(d), records or information specifically described and exempted from disclosure by statute, is misplaced. The statute relied upon by defendant as the basis for the exemption is § 8(f) of the OMA, which allows a public body to meet in a closed session to review the specific contents of an application for employment. The regents' travel destinations, of which plaintiffs sought disclosure, are not part of the specific contents of the candidates' applications. Therefore § 13(1)(d) is inapplicable.

In summary, we hold that the use by defendant of overlapping, intercommunicating, subquorum groups in its presidential selection process was done in direct circumvention and violation of the OMA. Because there is real and imminent danger of irreparable injury when governmental bodies meet and act in secret, *Detroit News,* p 301, we enjoin defendant from any use of this procedure in the future. We also hold that the trial court properly denied plaintiffs' FOIA request, because the disclosure of the regents' travel destinations would constitute a "clearly unwarranted invasion" of the candidates' privacy. We award plaintiffs' attorney fees and costs pursuant to MCL 15.271(4); MSA 4.1800(21)(4), and we remand this case to the trial court for the limited purpose of determining such fees and costs. We do not retain jurisdiction.

Affirmed in part, reversed in part, and remanded.

Hood, P.J., concurred.

G. S. Allen, J. *(concurring)*. While I agree that the board's use of multiple subcommittees amounted to a "constructive quorum" as defined in *Booth Newspapers, Inc v Wyoming City Council,* 168 Mich App 459; 425 NW2d 695 (1988), and therefore was a violation of the Open Meetings Act (OMA), MCL 15.261 *et seq.*; MSA 4.1800(11) *et seq.,* I do not believe the board was acting in bad faith or intended to directly circumvent the objective of promoting openness and accountability in government. Instead, I believe the board thought that *Wyoming* was not applicable because that case did not involve an employment matter, which, under § 8(f) of the OMA, MCL 15.268(f); MSA 4.1800(18)(f), may be discussed in a closed meeting. Section 8(f) reads:

> A public body may meet in a closed session only for the following purposes:
>
> * * *
>
> To review the specific contents of an application for employment or appointment to a public office if the candidate requests that the application remain confidential. However, all interviews by a public body for employment or appointment to a public office shall be held in an open meeting pursuant to this act.

The language of this statute is ambiguous at best. The first sentence permits closed meetings when the subject matter is a review of an application for employment or appointment to public office. The second sentence requires that the meeting be open if it is an interview by the public body

for employment or appointment. The question is which sentence applies when, as here, the interview is not for final selection or appointment, but is part of the weeding-out process. The trial court ruled that, while it did not approve of the use of overlapping subquorum committees, nothing in the OMA applied to the prescreening activities of the board in its search for a university president.

> This trial court has full respect for the *Wyoming* case, and in fact, agrees that application of the theory of "constructive quorum" was proper and produced a just result in that case, but, the subject matter of the present University of Michigan case is so different that for reasons of public policy a different result must be reached here else more harm than good would result to the people of the State of Michigan. The Court does not approve, nor does it wish to appear to condone, the use of overlapping and intercommunicating sub-quorum committees of the boards of public bodies as a contrived means of circumventing the OMA of [sic] FOIA. Neither, however, does the Court condemn the Board of Regents for their well-intentioned desire to carry out their Constitutional duty to recruit and select the very best qualified person for appointment as president of the University of Michigan, given the potential restrictions posed by the OMA, the FOIA, and the effect that an unthinking application of the *Wyoming* precedent might have upon the public good.

Given the ambiguity of the statute, I agree with the respected trial judge that the board's use of subquorum groups was done in good faith and that screening interviews for the presidency of a college or university should be exempt from the requirements of the OMA. However, I also agree with my colleagues that this is not the language in the statute and that any change should be made by the Legislature.

This matter concerns more than the University of Michigan. It concerns all universities and colleges in this state, particularly where there is an impending or existing vacancy in the office of president. I would urge that the Legislature take remedial action promptly.