642 A.2d 619

The MORNING CALL, INC., Elliot Grossman, Appellants,

v.

The BOARD OF SCHOOL DIRECTORS OF the SOUTHERN LEHIGH SCHOOL DISTRICT, William Herring, John Siplak, Lowell Linde, Susan Miracle, Marley Numbers, Ann Urbani, Sharon Dries, Howard Graeffe, Harry Quigley.

Commonwealth Court of Pennsylvania.

Argued April 11, 1994.

Decided May 24, 1994.

Petition for Allowance of Appeal Denied Dec. 30, 1994.

264

Malcolm J. Gross, for appellants.

Andrew E. Faust, for appellees.

Before McGINLEY and PELLEGRINI, JJ., and RODGERS, Senior Judge.

PELLEGRINI, Judge.

The Morning Call, Inc. and Elliot Grossman, a reporter for that newspaper (collectively, The Morning Call) appeal an order of the Court of Common Pleas of Lehigh County denying their motion for summary judgment and granting the cross-motion for summary judgment filed by the Board of School Directors of the Southern Lehigh School District, William Herring, John Siplak, Lowell Linde, Susan Miracle, Marley Numbers, Ann Urbani, Sharon Dries, Howard Graeffe, and Harry Quigley (collectively, the Board).

In October of 1991, the superintendent of the Southern Lehigh School District announced his resignation effective June of 1992. The Board agreed to use a consultant to aid in the selection process for a new superintendent and inter-

viewed three different consultants in executive session.[1] After selecting one of the individuals, a public meeting was held at which the Board voted and agreed to use the selected individual's services. The first step taken in the selection process was by the consultant who advertised for the superintendent position, screened the applicants who had applied, and reduced the number of candidates to six individuals who would be interviewed by the Board. Prior to being interviewed by the Board, one of the candidates withdrew his name because he was concerned that his candidacy would become public knowledge and would impact negatively on his current employment.

After the consultant provided the Board with the names of five candidates, the Board, along with the consultant, met in executive session on February 22, 1992, solely to interview four of the candidates. On February 27, 1992, the Board and the consultant again met in executive session to interview the fifth candidate and to discuss which of the five candidates would be moved forward for further consideration for the superintendent position. After discussion and voting on the five candidates, the Board chose three "finalists" whose names were later made public. A public session was then held so that citizens could meet and speak with the candidates. That meeting was followed by another public session on March 9, 1992, where the Board sought input from the community members, teachers and administrators based on their opinions of the three candidates.

On March 11, 1992, the Board held another executive session at which time it again interviewed the three finalists. Upon completion of the interviews, the Board narrowed these candidates to one individual for the superintendent position by ranking their choices. After further investigation of this individual was completed by the Board, another executive session was held on March 23, 1992, where the proposed employment contract for that candidate was discussed. Final-

1. Under Section 3 of the Sunshine Act, Act of July 3, 1986, P.L. 388, 65 P.S. § 273, "executive session" is defined as a meeting from which the public is excluded, although the agency may admit those persons necessary to carry out the purpose of the meeting. Included within the definition of "agency" under that same section is "school board."

ly, at a public meeting on April 6, 1992, the Board voted to accept the remaining candidate for the superintendent position and the employment contract.

After the superintendent position was filled, The Morning Call filed a complaint against the Board seeking a declaratory judgment that the Board had violated Section 4 of the Sunshine Act, 65 P.S. § 274,[2] when it voted on the candidates at the February 27, 1992 executive session, and selected three of the five candidates as finalists for the superintendent position. It contended that the voting which took place to determine the three finalists constituted official action and had to take place at a public meeting.

In response, the Board filed an answer denying that official action had taken place at the February 27, 1992 meeting even though a vote had occurred. It argued that its selection of the three finalists was properly held in executive session pursuant to Section 8 of the Sunshine Act, 65 P.S. § 278(a)(1), permitting employment and appointment matters to be dealt with in executive session.[3] The Morning Call then filed a motion for summary judgment relying on Section 4 of the Sunshine Act and the Board filed a cross-motion for summary judgment relying on Section 8 of the Sunshine Act.

The trial court determined that the Board's actions at the February 27, 1992 executive session culminating in the reduction of the number of candidates from five to three was permitted under Sections 4 and 8 of the Sunshine Act because they were merely deliberations or discussions rather than official action. Stressing the importance of maintaining reasonably necessary confidentiality in the preliminary stages of the employment search process, the trial court also noted that the vote taken at the executive session was "really nothing

2. That section provides that official action and deliberations by a quorum of the members of an agency shall take place at a meeting open to the public unless closed under Sections 7, 8 or 12.

3. The Board also submitted the deposition testimony of William Herring, the President of the Board, who testified that a vote had been taken regarding two of the five candidates during the February 27, 1992 executive session.

more than a further rating and ranking of these non-finalists", and the choice of the word "vote" "ignores the process which was occurring." It then granted the Board's cross-motion for summary judgment and denied The Morning Call's motion for summary judgment. The Morning Call then filed this appeal arguing that the Board's actions at the February 27, 1992 executive session constituted official action in violation of the Sunshine Act.[4]

Section 4 of the Sunshine Act, 65 P.S. § 274, provides that official action and deliberations [5] by a quorum of the members of an agency shall take place at a meeting open to the public unless closed under Sections 7 (relating to audits), 8 or 12 (relating to meetings of the General Assembly). Under Section 8 of the Sunshine Act, six reasons are listed when an executive session may be held. Inclusive within that section is the allowance for executive session when dealing with employment matters.[6] Specifically, Section 8(a)(1) of the Sunshine

---

4. Our scope of review of the granting of a motion for summary judgment is limited to determining whether the trial court committed an error of law or an abuse of discretion. *Wilson v. Ridgway Area School District*, 141 Pa.Commonwealth Ct. 607, 596 A.2d 1161 (1991), *petition for allowance of appeal denied*, 530 Pa. 650, 607 A.2d 258 (1992). When considering a motion for summary judgment, all well-pleaded facts in the non-moving party's pleadings must be accepted as true. *Downing v. Philadelphia Housing Authority*, 148 Pa.Commonwealth Ct. 225, 610 A.2d 535, *petition for allowance appeal denied*, 532 Pa. 658, 615 A.2d 1314 (1992). In order for a summary judgment motion to be sustained, the case must be clear and free from doubt. *Benson v. City of Philadelphia*, 146 Pa.Commonwealth Ct. 388, 606 A.2d 550, *petition for allowance of appeal denied*, 532 Pa. 657, 615 A.2d 1313 (1992).

5. "Deliberation" is defined under Section 3 of the Sunshine Act as the discussion of agency business held for the purpose of making a decision.

6. Also included under that section as reasons to hold executive sessions are:
 (2) To hold information, strategy and negotiation sessions related to the negotiations or arbitration of a collective bargaining agreement or, in the absence of a collective bargaining unit, related to labor relations and arbitration.
 (3) To consider the purchase or lease of real property up to the time an option to purchase or lease the real property is obtained or up to the time an agreement to purchase or lease such property is obtained if the agreement is obtained directly without an option.

Act, 65 P.S. § 278(a)(1), provides that an agency may hold an executive session:

> To *discuss* any matter involving the *employment, appointment,* termination of employment, terms and conditions of employment, evaluation of performance, promotion or disciplining *of any specific prospective public officer or employee* or current public officer or employee employed or appointed by the agency, or former public officer or employee, provided, however, that the individual employees or appointees whose rights could be adversely affected may request, in writing, that the matter or matters be discussed at an open meeting.

 While discussions relating to employment may be held in private, subsection (c) of Section 8 provides that official action taken as a result of those discussions must be taken at an open meeting. "Official action" is defined under Section 3 of the Sunshine Act, 65 P.S. § 273, as:

> (1) Recommendations made by an agency pursuant to statute, ordinance or executive order.
>
> (2) The establishment of policy by an agency.
>
> (3) The decisions on agency business made by an agency.
>
> (4) The *vote* taken by any agency on any motion, proposal, resolution, rule, regulation, ordinance, report or order. (Emphasis added.)

The Morning Call does not dispute that discussions in executive session on the candidates for the position of superintendent were within the personnel exception. However, it argues

(4) To consult with its attorney or other professional advisor regarding information or strategy in connection with litigation or with issues on which identifiable complaints are expected to be filed.

(5) To review and discuss agency business which, if conducted in public, would violate a lawful privilege or lead to the disclosure of information or confidentiality protected by law, including matters related to the initiation and conduct of investigations of possible or certain violations of the law and quasi-judicial deliberations.

(6) For duly constituted committees of a board or council of trustees of a State-owned, State-aided or State-related college or university or community college or of the Board of Governors of the State System of Higher Education to discuss matters of academic admission or standings.

that this exception does not apply here because the Board not only discussed the candidates for the superintendent position, but also "voted" on who was to be part of the narrowed field of candidates (from five to three) that would remain in contention. As such, The Morning Call contends that this reduction by "vote" was an "official action" required to be held at a public meeting under the Sunshine Act.[7]

The Board, however, argues that the "vote" taken at the executive session on February 27, 1992, was not the type of vote that fell within the definition of official action. It points out that the vote taken was a vote on a matter which was secondary to the ultimate matter to be decided, and the Sunshine Act envisions that such a vote is a necessary component of the discussion that precedes true official action, especially where there is a need for privacy in considering candidates. We agree.

■■■■ Just because a "vote" is taken in executive session does not mean that it is an "official action" as defined under the Sunshine Act. To be a vote constituting official action as defined in Section 3 of the Sunshine Act, it must be on a matter that commits the agency to a course of conduct. When an agency eliminates candidates in an executive session

---

7. The Morning Call also directs our attention to the first three subsections under the definition of official actions and contends that the Board's actions consisted of making recommendations as to which of the five candidates would be finalists, establishing policy, and making decisions to move along three of the five candidates to the next stage in the selection process where their names would be announced to the public.

However, The Morning Call has neither alleged that recommendations were made as a result of a specific statute, ordinance or executive order pursuant to subsection (1) nor has it explained what policy it believes the Board was establishing pursuant to subsection (2). The Board's actions also do not constitute decisions made by an agency on agency business pursuant to subsection (3). "Agency business" is defined under Section 3 of the Sunshine Act as the framing, preparation, making or enactment of laws, policy or regulations, the creation of liability by contract or otherwise, or the adjudication of rights, duties and responsibilities, but not including administrative action. The Morning Call has not provided any explanation as to why the Board's actions would fall within this definition.

through a "straw vote", that vote is not official action contemplated by the Sunshine Act that must take place in public, but is part of that discussion and deliberation authorized to be conducted at a private executive session, or, as the trial court found, "really nothing more than a further rating and ranking of these non-finalists." Here, the vote required to be taken publicly as envisioned by Section 4 of the Sunshine Act is the one that commits the Board to hire a specific person as superintendent.

Confirming that analysis is Section 508 of the Public School Code of 1949,[8] 24 P.S. § 5–508, which delineates the type of actions that must be recorded in the minutes of the school boards' meetings. One of those requirements is that the appointment of a district superintendent must be accomplished by the affirmative vote of the majority of the board of school directors and that vote is recorded. Specifically, that section provides in pertinent part:

> The affirmative vote of a majority of all the members of the board of school directors in every school district, *duly recorded, showing how each member voted,* shall be required in order to take action on the following subjects:—
>
> . . . .
>
> *Appointing or dismissing district superintendents,* assistant district superintendents, associate superintendents, principals, and teachers. (Emphasis added.)

Even if the Board chose to "vote" in public on the reduction of the candidates from five to three, under this provision, that action neither required an affirmative vote by all of the members of the Board nor recordation in the minutes. By not so requiring, the General Assembly inferentially indicated that actions to reduce the field of candidates were merely part of the discussions and deliberations, and the "vote" that was the official action was the appointing of a superintendent.

8. Act of March 10, 1949, P.L. 30, *as amended.*

Because Section 8(a)(1) of the Sunshine Law [9] allows discussion on personnel matters to be held in private, including the hiring of superintendents, and Section 508 of the Public School Code of 1949, 24 P.S. § 5–508, only requires the recordation of a final vote on the hiring of a superintendent, everything that took place before the final vote on the specific individual considered for the position of superintendent was mere discussion and not official action.

This interpretation is consistent with *Consumers Education and Protective Association v. Nolan,* 470 Pa. 372, 368 A.2d 675 (1977), where our Supreme Court held that it was within the scope of the former Sunshine Act [10] that the Senate of Pennsylvania could vote to reject the Governor's nominee to the Public Utility Commission (PUC) at executive session. In *Nolan,* an individual was appointed to fill a vacancy on the PUC while the Senate was not in session and without Senate confirmation. When the Rules and Executive Nominations

9. The purpose of the Sunshine Act as set forth in Section 2, 65 P.S. § 272, is to provide the public with the right to witness the decision-making process of agencies and to prevent secrecy in public affairs. Recognizing that certain areas such as discussions of personnel were against the public interest and/or personal privacy concerns outweighed those discussions being held in public, the General Assembly allowed those discussions to be held in private, but with the final decision being made in open session. In the case of hiring public officials, public policy allows that the selection process for public officials be conducted at executive session in order to attract the largest number of qualified candidates without compromising their professional reputations or standing at their current positions. As the Board points out, personnel matters are intended to be discussed and voted on in executive session so that it may openly and candidly discuss the strengths and weaknesses of candidates. To engage in the screening of applicants at a public meeting would undoubtedly interfere with that process because qualified applicants would be discouraged from applying and the pool of candidates would not necessarily be comprised of those best qualified for the position. Evidence of that possibility occurring was already exhibited in this case when one of the original six candidates chosen from the entire application pool removed himself from the running because he was concerned that his interest in the position would be publicly disclosed and would jeopardize his current job.

10. The former "Sunshine Act" was formally referred to as the Open Meeting Law, Act of July 19, 1974, P.L. 486, 65 P.S. §§ 261–269, repealed by the Act of July 3, 1986, P.L. 388. The Open Meeting Law was replaced by the present Sunshine Act.

Committee of the Senate convened at a closed session, the Senate voted to refer the appointment of the nominee to the Senate floor for a confirmation vote.

The Consumers Education and Protective Association which attended the closed session filed a complaint alleging that the vote to bring the nominee's appointment to the Senate floor violated the Sunshine Act because it constituted formal action which had to be conducted in an open meeting. Our Supreme Court held that the vote to refer the appointment of the nominee to the Senate floor was not a violation of the Sunshine Law because "the Act reveals a clear distinction between the openness required of agencies with respect to their policy-making decisions, and the confidentiality permitted them with respect to executive decisions about the character and competence of individuals."[11] *Id.*, 470 Pa. at 389, 368 A.2d at 684.

Here, there is no doubt that the Board's discussions and deliberations reducing the number of candidates required confidentiality in order to receive a qualified group of candidates and to narrow those candidates to one finalist.[12] Howev-

11. The court relied on Section 3 of the former Sunshine Act, 65 P.S. § 263, which provides that an agency subject to the Act may go into executive session, thereby excluding the public, for the purpose of considering dismissal or disciplining of or hearing complaints or charges brought against a public elected officer, employee or other public agency unless such person requests a public hearing. This language is substantially the same as that found under Section 8 of the present Sunshine Act, 65 P.S. § 278, which allows the agency to hold an executive session to discuss any matter involving the employment, appointment, termination of employment, terms and conditions of employment, evaluation of performance, promotion or disciplining of any specific prospective public officer or employee or current public officer or employee employed or appointed by the agency.

12. This is evidenced as noted by the Board's consultant in his affidavit presented to the trial court:

6. Anonymity of the candidates until the final stages of the selection process is necessary to attract highly qualified individuals who are presently employed in other districts and has been a component of every search for superintendent that I have conducted.
7. The inquiries and publicity made by the press seeking the names of individuals before the final stages of the process in the case of the Southern Lehigh School District resulted in the withdrawal of one of the most qualified candidates, who did not wish his employer to know

er, in opposition to this rationale based on confidentiality, The Morning Call brings to our attention *Booth Newspapers, Inc. v. University of Michigan Board of Regents,* 192 Mich.App. 574, 481 N.W.2d 778 (1992).

In that case, the Board of Regents were seeking a new president for the University of Michigan. From a candidate pool of 250, they cut the prospective candidates to 1 finalist via interviews with the candidates and discussions among the Board members at private meetings. The Court of Appeals of Michigan, however, held that even though no votes had actually been taken at closed meetings, decisions made by the Board of Regents to eliminate certain candidates in the hiring process were violative of the Open Meetings Act (OMA).

The OMA requires that all decisions of a public body be made at a meeting open to the public, and "decisions" is defined as "a determination, action, vote or disposition upon a motion, proposal, recommendation, resolution, order, ordinance, bill or measure on which a vote by members of a public body is required and by which a public body effectuates or formulates public policy." However, because the question in this case is whether a vote, rather than decisions, is violative of the Sunshine Law, we find that *Booth* is not persuasive.

The Sunshine Act allows for a private executive session to insure that confidentiality in the selection process be maintained in order to attract the best candidates. The official action required by the Sunshine Act to be done in public session is the vote to hire a specific individual as superinten-

that he was actively seeking a position with another district until his prospects for selection became clear.

9. Maintaining the confidentiality of the names of candidates for the position of school district superintendent is necessary to insure an adequate pool of qualified and experienced candidates and is consequently critical to an appropriate selection process. The most desirable candidates are those who currently hold superintendent or high administrative positions with other Pennsylvania school districts and whose effectiveness in those positions would be severely compromised by the premature disclosure of information concerning their candidacy for another such position.

dent.[13] Accordingly, based upon the well-reasoned opinion of Judge Thomas A. Wallitsch of the Court of Common Pleas of Lehigh County, the decision of the trial court granting the Board summary judgment is affirmed.

## ORDER

AND NOW, this 24th day of May, 1994, the order of the Court of Common Pleas of Lehigh County, dated April 19, 1993, No. 92–C–0553, is affirmed.

**13.** The Board also argues that even if it violated the Sunshine Act in the selection process, that violation was cured by the public vote for the superintendent that took place on April 6, 1992, and renders The Morning Calls' complaint moot. However, based on our decision that it did not violate the Sunshine Act, we need not address this issue.