HOUSE SPEAKER v GOVERNOR

MICHIGAN UNITED CONSERVATION CLUBS v GOVERNOR

MICHIGAN ENVIRONMENTAL PROTECTION FOUNDATION v
GOVERNOR

Docket Nos. 148677, 148678, 148679. Submitted May 6, 1992, at
Lansing. Decided August 3, 1992, at 10:25 A.M. Leave to appeal
granted, 441 Mich —.

Lewis N. Dodak, Speaker of the House of Representatives, and
other members of the Legislature brought an action in the
Ingham Circuit Court against Governor John M. Engler and
Director of the Department of Natural Resources Roland
Harmes, seeking an injunction against the implementation of
Executive Order 1991-31. The order sought to reorganize the
Department of Natural Resources by: abolishing the existing
department and creating a new department, eliminating many
boards and commissions that are part of the existing depart-
ment, transferring many of the powers and functions presently
exercised by the Natural Resources Commission to the director
of the new department, and giving the Governor the power to
appoint the chairperson of the commission. The Michigan
United Conservation Clubs and some of its members and the
Michigan Environmental Protection Foundation and some of its
members filed similar actions. The Foundation also sought an
injunction against the implementation of Executive Order 1991-
33, which sought to create an Environmental Science Board
that would advise the Governor on environmental issues. The
actions were consolidated by the trial court, Peter D. Houk, J.,
which granted summary disposition for the plaintiffs and en-
joined implementation of Executive Order 1991-31. The court
did not address implementation of Executive Order 1991-33,
and denied the Foundation's request for an award of costs and
attorney fees. The defendants appealed. The Foundation cross
appealed.

The Court of Appeals *held:*

REFERENCES

Am Jur 2d, Constitutional Law §§ 303, 305; Governor §§ 4, 5.

See the Index to Annotations under Constitutional Law; Govern-
ment; Governors.

The trial court properly held that the plaintiffs had standing to sue and were entitled to an injunction prohibiting implementation of Executive Order 1991-31. Because creation of the Environmental Science Board by Executive Order 1991-33 clearly contemplated the creation of the new Department of Natural Resources by Executive Order 1991-31, the preclusion of the implementation of 1991-31 also precludes the implementation of 1991-33. The trial court properly refused to award attorney fees and did not abuse its discretion in refusing to award costs.

1. Speaker Dodak and the other legislator plaintiffs, by challenging Executive Order 1991-31, have asserted substantial interests as legislators that differ in kind from the citizenry at large and thus provide them with the necessary standing to bring this action. The Michigan United Conservation Clubs and the Michigan Environmental Protection Foundation and their members have standing to sue both as taxpayers affected by the executive orders and as nonprofit organizations incorporated to protect the rights of the members.

2. The questions raised are not political questions but rather are justiciable questions of constitutional interpretation.

3. The Governor is not immune from a suit challenging on constitutional grounds his authority to reorganize the executive branch of government.

4. The Governor lacks both constitutional and statutory authority to implement Executive Order 1991-31. The constitutional provision relating to the reorganization of the executive branch, when read in conjunction with the provisions of the schedule and temporary provisions that were adopted in conjunction with and to provide transition to the 1963 Constitution, evidence a clear intent that the Governor's constitutional power to reorganize the executive branch is not self-executing and is subject to the provisions of the Executive Organization Act.

5. Because violation of the Open Meetings Act, the Freedom of Information Act, or the federal civil rights act was neither adequately pleaded nor proved, the trial court properly denied the request for attorney fees. Further, the court did not abuse its discretion by refusing to tax other costs, a public question being involved.

Affirmed.

REILLY, J., dissenting in part, stated that the majority correctly decided the questions of standing, immunity from suit, attorney fees, and costs, but erred in finding the executive

orders invalid. The constitution clearly grants to the Governor the power to undertake the type of reorganization contemplated in the executive orders, with implementation being subject only to disapproval by a majority vote in each chamber of the Legislature.

1. CONSTITUTIONAL LAW — GOVERNOR — EXECUTIVE ORDERS — IMMUNITY FROM SUIT.

The Governor is not immune in an action seeking declaratory and injunctive relief on the basis that the Governor exceeded constitutional authority in attempting to reorganize the executive branch by executive order (Const 1963, art 5, § 2).

2. CONSTITUTIONAL LAW — GOVERNOR — EXECUTIVE REORGANIZATION — PRINCIPAL DEPARTMENTS.

Any legislative power that the Governor possesses must be expressly granted by the Michigan Constitution; although the Governor has express power to reallocate functions and reorganize executive departments, no provision of the constitution expressly grants the Governor the power to create a new principal department (Const 1963, art 3, § 2).

3. CONSTITUTIONAL LAW — GOVERNOR — EXECUTIVE REORGANIZATION — TRANSFER OF FUNCTION.

The Governor, in exercising reorganization powers under the constitution, must use the transfer mechanisms established in the Executive Organization Act; although that act allows the Governor to abolish existing boards and commissions and to transfer their functions to a principal department, it does not grant the Governor authority to abolish the functions of boards, commissions, or principal departments (Const 1963, art 5, § 2; MCL 16.103[c]; MSA 3.29[3][c]).

4. CONSTITUTIONAL LAW — GOVERNOR — EXECUTIVE REORGANIZATION — NATURAL RESOURCES COMMISSION.

The Governor has neither constitutional nor statutory authority to transfer from the members of the Natural Resources Commission to the Governor the power to select the chairperson of the commission (Const 1963, art 5, § 2; MCL 16.354; MSA 3.29[254]).

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *Susan I. Leffler, Mary Kay Scullion,* and *Raymond O. Howd,* Assistant Attorneys General, for plaintiffs in Docket No. 148677.

*M. Carol Bambery,* and *Tom Downs,* of Counsel, for plaintiffs in Docket No. 148678.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *Deborah Anne Devine* and *Thomas C. Nelson,* Assistant Attorneys General, for the defendant.

*Peter W. Steketee,* and *Karen Kendrick-Hands,* and *Marcia M. McBrien,* for plaintiff in Docket No. 148679.

Amici Curiae:

*Dykema Gossett* (by *Richard D. McLellan, William J. Perrone,* and *Lori M. Silsbury*), and *Dickinson, Wright, Moon, Van Dusen & Freeman* (by *Peter H. Ellsworth* and *William C. Bertrand, Jr.*), for George Romney.

*Helveston, Waldman, O'Hare, Helveston, Hodges & Barnes, P.C.* (by *Theodore Sachs* and *Eileen Nowikowski*), and *Jordan Rossen, Connye Y. Harper,* and *Richard W. McHugh,* International Union, UAW, for International Union, UAW, Michigan State AFL-CIO, Ken Morris, Jesse A. Damesworth, Robert Kellerman, and William Tuinstra.

Before: WAHLS, P.J., and MARILYN KELLY and REILLY, JJ.

MARILYN KELLY, J.

BACKGROUND AND ISSUES ON APPEAL

Defendants appeal as of right from an order of the Ingham Circuit Court which granted summary disposition to plaintiffs and enjoined defendants

from implementing Executive Order 1991-31. They argue on appeal that plaintiffs lacked standing and that the claims are nonjusticiable political questions. They assert that the Governor is absolutely immune from suit and that his executive order was a valid exercise of authority granted him by the Michigan Constitution. Plaintiffs Michigan Environmental Protection Foundation et al. (MEPF) cross appeal, arguing that the trial court erred in denying them attorney fees and costs and in failing to find a second executive order, EO 1991-33, unconstitutional.

EO 1991-31 alters the state's role with respect to its natural resources by expressly abolishing the existing Department of Natural Resources (DNR) and creating a new one. The trial court characterized the order as an attempt to accomplish the most comprehensive reorganization of state government since the implementation of the 1963 constitution. A second order, EO 1991-33, creates an Environmental Science Board to advise the Governor on environmental issues.

The circuit court ruled that all the plaintiffs had standing. It then found that EO 1991-31 violated the separation of powers clause of the Michigan Constitution. Const 1963, art 3, § 2. In addition, it determined that, in issuing EO 1991-31, the Governor exceeded his authority under both the Michigan Constitution and the Executive Organization Act, MCL 16.101 *et seq.*; MSA 3.29(1) *et seq.* It found the Governor lacked authority to appoint the head of the Natural Resources Commission (NRC). It ruled he was not empowered to abolish commissions and boards whose functions include the holding of public hearings. The court concluded by ruling that EO 1991-31 was not violative of the Open Meetings Act, MCL 15.261 *et seq.*; MSA 4.1800(11) *et seq.*, Freedom of Information

Act, MCL 15.231 *et seq.*; MSA 4.1801(1) *et seq.*, Revised Judicature Act, MCL 600.101 *et seq.*; MSA 27A.101 *et seq.*, or substantive due process. The court refused to award attorney fees on the basis that a public question was involved.[1]

We affirm the actions of the circuit court.

## THE PLAINTIFFS HAVE STANDING

Defendants argue initially that plaintiffs lacked standing to bring this action. The requirement of standing ensures that only those who have a substantial interest in a dispute will be allowed to come into court to be heard. *House Speaker v State Administrative Bd,* 190 Mich App 260, 265; 475 NW2d 440 (1991), lv gtd 439 Mich 1013 (1992), citing *Highland Recreation Defense Foundation v Natural Resources Comm,* 180 Mich App 324, 328; 446 NW2d 895 (1989). Plaintiffs must show both a substantial interest in the dispute and that they will be detrimentally affected by the litigation in a manner different than the citizenry at large. *House Speaker,* 266, citing *Muskegon Building & Construction Trades v Muskegon Area Intermediate School Dist,* 130 Mich App 420, 423-424; 343 NW2d 579 (1983).

In *House Speaker,* certain legislators brought suit claiming that the state administrative board's transfer of funds within various state departments exceeded the board's statutory authority and violated the state constitution. They asserted that the intertransfers could be accomplished only by the state budget director, subject to review by legislative appropriations committees. Alternatively, they argued that, if the Management and Budget Act,

---

[1] Defendants are not appealing from the trial court's ruling that the Governor may not delegate power to persons not authorized by statute to exercise it. They are also not appealing from the ruling that the Governor may not create new levels of adjudicatory hearings.

MCL 18.1101 *et seq.*; MSA 3.516(101) *et seq.*, authorized the transfers, the act was unconstitutional, as it delegated legislative power to the executive branch of state government. This Court determined that, under either theory, the legislators, members of the appropriations committees or their appointors, clearly asserted substantial interests different in kind from those of the citizenry at large. *Id.,* 266-267.

As in *House Speaker,* the legislator plaintiffs here argue that the Governor violated the separation of powers clause by exceeding the scope of legislative power which Michigan's constitution grants him. Const 1963, art 5, § 2. The legislator plaintiffs are: Lewis Dodak, Speaker of the Michigan House of Representatives; Thomas Alley, Chair of the House Committee on Conservation, Recreation and the Environment; Tracey Yokich, member of the House Committee on Conservation, Recreation and the Environment; John D. Cherry, the Senate Minority Floor Leader; and Arthur Miller, the Senate Minority Leader.

The Michigan Legislature is constitutionally mandated to protect the natural resources of this state from pollution, impairment and destruction. The executive order challenged eliminates a substantial number of boards and commissions which the Legislature created for the purpose of protecting the environment. See Const 1963, art 4, § 52. We agree with the trial court that the legislator plaintiffs clearly have asserted substantial interests as legislators different in kind from those of the citizenry at large. *House Speaker,* 267.

Plaintiffs Michigan United Conservation Clubs et al. (MUCC) and MEPF also unquestionably had standing to bring this action and to obtain the relief sought and granted. The trial court ruled that their standing was based on their status as

taxpayers. MCR 2.201(B)(4). Mucc and mepf are nonprofit corporations, organized for civic, protective or improvement purposes. They and five or more of their members, who own property assessed for direct taxation by the county in which they reside, filed this action. MCR 2.201(B)(4)(a) and (b). In concert with the legislator plaintiffs, these plaintiffs alleged that the executive order exceeded the Governor's authority and that any expenditure of funds by a new DNR would be illegal. MCR 2.201(B)(4).

The standing of MUCC and MEPF may be based, also, on their status as nonprofit corporations which were incorporated to establish and protect the rights and interests of their members. See *Muskegon Building Trades,* 428. Individual plaintiffs are members of MUCC or MEPF and either are also members of, or regularly attend and speak at meetings of, boards and commissions to be abolished under EO 1991-31. These plaintiffs clearly have a substantial interest different in kind from the citizenry at large. See *Muskegon Building Trades, supra.*

### NONJUSTICIABLE POLITICAL QUESTIONS ARE NOT INVOLVED

Defendants next assert that the trial court should have used its "equitable discretion" and dismissed this case, because the matters at issue are nonjusticiable political questions. They point out that the doctrine of equitable discretion should be applied, since the Legislature may: 1) elect to reject the two contested executive orders by mustering a majority vote of both the House and Senate; 2) overturn the orders through subsequent legislation; and 3) reduce the orders' effectiveness through the appropriations process.

The federal doctrine of equitable discretion has been applied "where a congressional plaintiff could obtain substantial relief from his fellow legislators through the enactment, repeal, or amendment of a statute." *House Speaker,* 270, citing *Dornan v United States Secretary of Defense,* 271 US App DC 195, 196; 851 F2d 450 (1988). Here, the legislator plaintiffs seek a judicial determination that the Governor unlawfully usurped authority which the constitution granted to the Legislature. They argue that they could not obtain "substantial relief" if the Legislature rejected, overturned or reduced the effectiveness of EO 1991-31 and EO 1991-33; no legislative action could prevent the Governor from once again exceeding his authority in the guise of yet another executive reorganization. We agree and decline to apply the federal doctrine of equitable discretion to this case.

The trial court was correct in determining that this case does not present nonjusticiable political questions. The decision whether the constitution committed a matter to another branch of government, or whether the actions of a branch exceeded the authority committed, is a matter of constitutional interpretation. As such, the decision is the responsibility of the courts as the ultimate interpreter of the constitution. See *Baker v Carr,* 369 US 186, 211; 82 S Ct 691; 7 L Ed 2d 663 (1962).

### THE GOVERNOR IS NOT IMMUNE FROM SUIT

Defendants argue that the Governor is absolutely immune from suit in his exercise of legislative authority. They point out that state legislators and the Legislature itself enjoy a broad-based immunity. They are immune from suit for their enactment of legislation and other acts committed within their sphere of legislative activity. *77th*

*Dist Judge v Michigan,* 175 Mich App 681, 697; 438 NW2d 333 (1989), citing *Supreme Court of Virginia v Consumers Union of the United States,* 446 US 719, 731-734; 100 S Ct 1967; 64 L Ed 2d 641 (1980); *Tenney v Brandhove,* 341 US 367; 71 S Ct 783; 95 L Ed 1019 (1951).

In reviewing the complaint in this case, we see that plaintiffs asserted that the Governor acted outside the authority granted to him by the constitution to reorganize the executive branch. In essence, they alleged that the Governor acted outside his sphere of legislative authority. See *77th Dist Judge, supra.* Even legislators are not immune from suit when acting outside their "sphere" of authority. *Id.*

Plaintiffs have sought a declaratory judgment and an injunction, equitable relief, not money damages. Actions seeking only equitable relief do not normally fall within the purview of governmental immunity. *Hadfield v Oakland Co Drain Comm'r,* 430 Mich 139, 152, n 5; 422 NW2d 205 (1988). We conclude, based on the allegations in the complaint and the type of relief requested, that the Governor is not immune from liability. See *77th Dist Judge, supra; Hadfield, supra.*

### THE GOVERNOR LACKED AUTHORITY TO CREATE A NEW DNR

The heart of defendants' appeal is that EO 1991-31 represents a valid exercise of authority granted to the Governor by the Michigan Constitution. Const 1963, art 5, § 2. Defendants argue that the Governor had the authority to: reorganize the DNR; transfer functions to the director of the new DNR; appoint the chairperson of the Natural Resources Commission; and abolish commissions whose function it is to hold public hearings.

The Governor derives authority to reorganize the DNR from Const 1963, art 5, § 2, which provides:

> All executive and administrative offices, agencies and instrumentalities of the executive branch of state government and their respective functions, powers and duties, except for the office of governor and lieutenant governor and the governing bodies of institutions of higher education provided for in this constitution, shall be allocated by law among and within not more than 20 principal departments. They shall be grouped as far as practicable according to major purposes.
>
> Subsequent to the initial allocation, the governor may make changes in the organization of the executive branch or in the assignment of functions among its units which he considers necessary for efficient administration. Where these changes require the force of law, they shall be set forth in executive orders and submitted to the legislature. Thereafter the legislature shall have 60 calendar days of a regular session, or a full regular session if of shorter duration, to disapprove each executive order. Unless disapproved in both houses by a resolution concurred in by a majority of the members elected to and serving in each house, each order shall become effective at a date thereafter to be designated by the governor.

Under the first paragraph of § 2, the Legislature had two years to complete its allocation of functions, powers and duties to the principal departments. Const 1963, Schedule and Temporary Provisions, § 12. Had it failed to complete it within that period, the Governor had specific authority to act in its stead. *Id.* The Legislature did in fact make the allocation in a timely fashion by passing the Executive Organization Act (EOA). The act created nineteen principal departments of state govern-

ment, one of them being the DNR. MCL 16.104; MSA 3.29(4).

In ruling that the Governor exceeded his authority in creating a new Department of Natural Resources, the circuit court found he violated the separation of powers doctrine. Const 1963, art 3, § 2. This doctrine provides that no person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly permitted.

The Supreme Court has laid down two rules of construction which we follow when interpreting the state constitution:

> First, the interpretation given the constitution should be "the sense most obvious to the common understanding"; the one which "reasonable minds, the great mass of people themselves, would give it." Secondly, the "circumstances surrounding the adoption of the constitutional provision and the purpose sought to be accomplished may be considered." [*Soap & Detergent Ass'n v Natural Resources Comm,* 415 Mich 728, 745; 330 NW2d 346 (1982); citations omitted.]

Legislative implementations of constitutional provisions are entitled to weight but do not control our rulings. *Durant v Dep't of Education (On Remand),* 129 Mich App 517, 522; 342 NW2d 591 (1983), modified 424 Mich 364; 381 NW2d 662 (1985).

Former Michigan Governor George Romney argues in his brief amicus curiae that the second paragraph of § 2 is self-executing. As a result, he concludes, the Executive Organization Act should not be considered in our interpretation of this constitutional provision.

The Michigan Supreme Court has specifically found that the provisions of § 2 are not self-execut-

ing. *McDonald v Schnipke,* 380 Mich 14, 26; 155 NW2d 169 (1968). In *Soap & Detergent,* the Court made distinctions between the first and second paragraphs of § 2, but did not differentiate with respect to the question of self-execution. Therefore, we find that the Executive Organization Act is the enabling act of both paragraphs of § 2. See *Soap & Detergent,* 748.

Defendants argue that the holding in *Soap & Detergent* should control the outcome of this case. We disagree. In *Soap & Detergent,* the Governor had transferred the rulemaking power of the Water Resources Commission by executive order to the DNR and its department head, the NRC. The plaintiffs challenged the NRC's authority to promulgate a rule limiting phosphate content in detergents.

In interpreting § 2, the Court recognized that the intent of the constitutional convention was to grant the Governor full legislative power to promote the most efficient possible executive department. *Id.,* 747. The Court indicated that an executive order transferring rulemaking power from one executive agency to another is a change in the organization of the executive branch of government. It ruled that the executive order was within the Governor's power to reorganize the executive branch under the Michigan Constitution.

*Soap & Detergent* is clearly distinguishable from this case. There, the Governor was merely transferring functions. Here, the Governor was eliminating functions and creating an entirely new DNR. Furthermore, the Court in *Soap & Detergent* recognized that § 2 does not vest unlimited legislative power in the executive branch. *Id.,* 752. In fact, the area of executive exercise of legislative power is limited and specific. *Id.* Although the constitution granted the Governor authority to

allocate functions of new principal departments, that authority took effect only if the Legislature failed to make its allocation within two years. Const 1963, Schedule and Temporary Provisions, § 12.

Any legislative power that the Governor possesses must be expressly granted to him by the constitution. Const 1963, art 3, § 2. Although the Governor has the express power to reallocate functions and reorganize executive departments, no provision of the Michigan Constitution expressly authorizes him to create a new principal department. Our interpretion of art 5, § 2 is supported by the Executive Organization Act, constitutional debates and the "common understanding" of the provision. We agree with the trial court that, in creating a new DNR, the Governor violated the separation of powers doctrine and exceeded his authority under Const 1963, art 5, § 2. Therefore, we find EO 1991-31 unconstitutional.

### THE GOVERNOR MAY NOT ABOLISH THE FUNCTION OF COMMISSIONS TO HOLD PUBLIC HEARINGS

Defendants allege that the trial court erred in concluding that the Governor could not abolish eighteen boards and commissions which provide citizens the opportunity for public hearings.

The Governor, in exercising his reorganization powers under the constitution, uses the transfer mechanisms established under the Executive Organization Act. See *Soap & Detergent,* 748-750. One mechanism, called a Type III transfer, allows the Governor to abolish existing boards or commissions and to assign their functions to the principal departments. MCL 16.103(c); MSA 3.29(3)(c). However, although he is empowered to transfer, nowhere is the Governor granted authority to abolish

functions of the boards and commissions or of a principal department.

The boards and commissions which EO 1991-31 would abolish allow citizens to voice their opinions through public hearings. After public input, some of the boards and commissions are statutorily mandated to make recommendations and reports to the Legislature, the Governor, the DNR or a combination of them. See MCL 323.2; MSA 3.522; MCL 320.504(a); MSA 13.244(a). Some commissions have the authority to make substantial decisions or issue permits. MCL 336.15; MSA 14.58(5).[2]

Defendants argue that the executive order merely transfers the functions of these boards and commissions to the head of the new DNR. However, defendants have failed to set forth any credible evidence establishing that the functions would be preserved under the new DNR. They ask, as a leap of faith, that we believe the new DNR director and staff would have time and resources to perform the functions of eighteen boards and commissions. We cannot but believe, instead, that the Governor's actions have eliminated the hearing function. Therefore, we agree with the trial court that the Governor was without authority to abolish the boards and commissions as he did.

## TRANSFERS MUST BE SUPERVISED BY THE PRINCIPAL DEPARTMENT HEAD

Defendants argue that the trial court erred in finding that governmental functions transferred must be supervised by the head of the department receiving them.

Powers granted under Const 1963, art 5, § 2 must be exercised pursuant to the Executive Orga-

---

[2] We found MUCC's brief, which contained an outline of the abolished boards and commissions, particularly helpful.

nization Act, since the constitutional provision is not self-executing. *McDonald, supra.* Although statutes cannot supersede the constitution, constitutional provisions should not be read in isolation. See generally *Soap & Detergent, supra.*

The Executive Organization Act provides that, in Type II and III transfers, the head of a principal department must direct and supervise the administration of the transferred department's functions. MCL 16.107(b); MSA 3.29(7)(b). The Governor's EO 1991-31 retains the NRC as the head of the new DNR. However, it calls for the director of the new DNR, not the NRC, to supervise and direct the functions transferred to the new DNR.

In ruling on this question, the circuit court provided this apt analysis:

> The Order purports to continue the Natural Resources Commission as the head of the New Department. However, the Order eviscerates the Natural Resources Commission by placing the New Department under the executive direction of the Director, and the New Department and the Natural Resources Commission under the supervision of the Governor. This changes the entire nature of the Commission.

We agree with the trial court that the Governor exceeded his constitutional and statutory authority by delegating to the director of the new DNR the authority to supervise and administer the transferred functions.

### THE GOVERNOR HAS NO AUTHORITY TO APPOINT THE CHAIR OF THE NRC

Defendants assert that, contrary to the circuit court's ruling, the Governor does have authority to appoint the chair of the Natural Resources Com-

mission. Statutory authority provides that the chair of the NRC is selected by the commission's own members. MCL 16.354; MSA 3.29(254). Nothing in either Const 1963, art 5, § 2 or the EOA gives the Governor power to transfer from the commission's members to himself the selection of the chair. Moreover, the EOA mandates that any statutory authority transferred under it must be transferred to the head of a principal department, which in this case is the NRC. MCL 16.103(b); MSA 3.29(3)(b). Therefore, the Governor lacks authority to appoint the chair of the NRC.

### EO 1991-33 CANNOT BE IMPLEMENTED

Cross appellant MEPF argues that the trial court erred in failing to determine whether EO 1991-33 is illegal and unconstitutional. The order creates the Michigan Environmental Science Board, an independent entity within the Department of Management and Budget. It authorizes the board to advise the Governor, the NRC, the new DNR and other agencies regarding the protection and management of the natural resources in the state.

In deciding whether EO 1991-33 is unconstitutional, we must first determine whether the order can be implemented without EO 1991-31. The Michigan Supreme Court has declared that the same rules of construction are used for executive orders as for statutes. *Soap & Detergent,* 757. The Court drew the analogy, because executive orders are quasi-legislative in nature. *Id.* Therefore, we conclude that the statutory doctrine of in pari materia may be applied to executive orders.

The doctrine of in pari materia may be applied when statutes have a common purpose or relate to the same person, thing, or class of persons or things. *People v Rogers,* 438 Mich 602, 608; 475

NW2d 717 (1991), citing *Palmer v State Land Office Bd,* 304 Mich 628, 636-637; 8 NW2d 664 (1943). All statutes which have the same subject or general purpose should be read together as one law. *Rogers, supra.*

In this case, EO 1991-31 and EO 1991-33 have a common purpose: to make major changes in the existing structure of the DNR. The executive orders propose to eliminate the current DNR and to replace it with an agency and an advisory board controlled by the Governor. Based on the similar purpose of these orders, we conclude that it is appropriate to read them in pari materia.

EO 1991-33 provides that the board is to report its findings to the new DNR and to advise it on issues affecting the management of the state's natural resources. Without EO 1991-31, there is no new DNR to which to report. The plain language of EO 1991-33 permits no other conclusion than that it contemplated and assumed the implementation of EO 1991-31. We have declared EO 1991-31 unconstitutional. Therefore, we make the specific finding that EO 1991-33 cannot be implemented.

### THE TRIAL COURT PROPERLY REFUSED TO AWARD ATTORNEY FEES AND COSTS

The MEPF argues also that the trial court erred in failing to award it attorney fees and costs. This plaintiff sought attorney fees under the Open Meetings Act, Freedom of Information Act and the Civil Rights Act. MCL 15.271(4); MSA 4.1800(21) (4); MCL 15.240(4); MSA 4.1801(10)(4); 42 USC 1988. The trial court found that EO 1991-31 did not violate the Open Meetings Act (OMA) or the Freedom of Information Act (FOIA). Plaintiff MEPF does not appeal these rulings. The court did not decide whether the order violated the Civil Rights

Act. It denied attorney fees and costs on the basis that a public question was involved.

Attorney fees are generally not recoverable as an element of costs unless expressly allowed by statute or court rule. *DeWald v Isola (After Remand),* 188 Mich App 697, 699; 470 NW2d 505 (1991), citing *Matras v Amoco Oil Co,* 424 Mich 675, 695; 385 NW2d 586 (1986). If a court finds violations of either the OMA or the FOIA, it must award attorney fees. See MCL 15.271(4); MSA 4.1800(21)(4); MCL 15.240(4); MSA 4.1801(10)(4). A court has discretion whether to award attorney fees under the Civil Rights Act. 42 USC 1988.

In this case, the court did not decide whether EO 1991-31 violates the Civil Rights Act. However, it is clear that the civil rights claim was not instrumental in obtaining the permanent injunction against the implementation of EO 1991-31. See *Dorfman v Dep't of Transportation,* 155 Mich App 57, 62-63; 399 NW2d 437 (1986). Therefore, MEPF was not entitled to attorney fees under that claim. *Id.* Further, the court specifically found that EO 1991-31 did not violate the OMA or the FOIA. Since MEPF did not appeal these rulings, we must conclude that it is not entitled to attorney fees; it did not prevail on the claims under which it sought them.

MEPF claimed in its complaint that EO 1991-33 also violated the OMA and the FOIA. There is no need for us to review this issue in light of our disposition of EO 1991-31 and the relationship between the two executive orders. However, review of it is necessary in order for us to determine whether MEPF was entitled to attorney fees.

The FOIA allows for the recovery of attorney fees when the person filing the complaint asserts a right to inspect or receive a copy of a public record. MCL 15.240(4); MSA 4.1801(10)(4). From

the plain language of this section, it is clear that the action filed by MEPF is not the type that the Legislature contemplated to be appropriate for attorney fees. Therefore, we conclude that MEPF is not entitled to attorney fees under this act.

MEPF also asserts a right to attorney fees under the OMA. MCL 15.271(4); MSA 4.1800(21)(4) provides:

> If a public body is not complying with this act, and a person commences a civil action against the public body for injunctive relief to compel compliance or to enjoin further noncompliance with the act and succeeds in obtaining relief in the action, the person shall recover court costs and actual attorney fees for the action.

The purpose of the OMA is to promote openness and accountability in government. It is to be interpreted broadly to accomplish this goal. *Booth Newspapers, Inc v University of Michigan Bd of Regents,* 192 Mich App 574, 580; 481 NW2d 778 (1992), citing *Booth Newspapers, Inc v Wyoming City Council,* 168 Mich App 459, 466; 425 NW2d 695 (1988); *Detroit News, Inc v Detroit,* 185 Mich App 296, 300; 460 NW2d 312 (1990). The OMA provides that all decisions and meetings of a public body must be open to the public. MCL 15.263; MSA 4.1800(13).

MEPF claims that EO 1991-33 was enacted to avoid the OMA and the FOIA. It argues that the Science Board is "probably not a public body" as defined under the statute. MCL 15.262(a); MSA 4.1800(12)(a). However, neither the OMA nor case law supports a ruling that the mere formation of an advisory board through an executive order would violate the OMA. Therefore, we decline to award attorney fees to MEPF under this act.

Although MEPF is not entitled to attorney fees, it

may be entitled to costs. MEPF was not a prevailing party on its claims under which it sought attorney fees. However, it was a prevailing party on its permanent injunction claim. See MCR 2.625(B)(2).

The decision whether to award costs was a discretionary one and was in the hands of the trial judge. See MCR 2.625(A)(1) and (B)(2). Michigan courts frequently refuse to award costs when cases involve public questions. *American Aggregates Corp v Highland Twp*, 151 Mich App 37, 54; 390 Mich 192 (1986), citing *Ettinger v Avon Twp*, 64 Mich App 529; 236 NW2d 129 (1975); *Turkish v City of Warren*, 61 Mich App 435; 232 NW2d 732 (1975), modified on other grounds 406 Mich 137; 277 NW2d 475 (1979). That was the basis for refusal of costs in this case. We are unwilling to reverse the judge's exercise of discretion on this issue.

Affirmed.

WAHLS, P.J., concurred.

REILLY, J. *(concurring in part and dissenting in part).* I agree with the majority's reasoning and its conclusion that all the plaintiffs have standing, that the issues presented should be reviewed by this Court, that the Governor is not immune from an action seeking declaratory and injunctive relief when the plaintiffs claim that the Governor is acting outside his constitutional authority, that the Michigan Environmental Protection Foundation is not entitled to relief, and that no costs or attorney fees should be allowed.

However, I respectfully dissent from the majority's conclusion that the Governor violated the separation of powers doctrine and exceeded his authority under Const 1963, art 5, § 2 when he

issued Executive Order 1991-31, by which he created a new Department of Natural Resources in place of the old one, transferred functions among the executive units, and abolished various boards and commissions in the process, and Executive Order 1991-33, by which he created an advisory science board.

My basic disagreement with the majority relates to its interpretation of Const 1963, art 5, § 2 and its view that the enabling legislation, the Executive Organization Act, MCL 16.101 *et seq.*; MSA 3.29(1) *et seq.*, curtails the legislative power of reorganization granted to the Governor under the second paragraph of § 2.

I

The majority has determined that the Executive Organization Act not only gave effect to the first paragraph of § 2, but also applies to the second paragraph of § 2 as well, and effectively supersedes the reorganization powers granted to the Governor under the second paragraph of § 2. To support this position, the majority relies on statements by our Supreme Court in *Soap & Detergent Ass'n v Natural Resources Comm,* 415 Mich 728, 745; 330 NW2d 346 (1982), and *McDonald v Schnipke,* 380 Mich 14, 26, 155 NW2d 169 (1968), which recognized that art 5, § 2 was not self-executing. While I agree that neither the first paragraph nor the second paragraph of § 2 is self-executing, an examination of the rulings in those cases shows there is no basis for the majority's position that the enactment of the Executive Organization Act by the Legislature foreclosed any action by the Governor under the second paragraph of § 2.

In *McDonald,* as in *Soap,* the Supreme Court considered the meaning of the phrase "shall be

allocated by law" in the first paragraph of § 2. The Court ruled in both cases that that language was not self-executing, but required implementation by the Legislature within two years of adoption of the constitution, or by the Governor within the third year following adoption if the Legislature did not act, pursuant to the directive of Const 1963, Schedule and Temporary Provisions, § 12. *McDonald, supra* at 23; *Soap, supra* at 742. *McDonald* never discussed the language in the second paragraph of § 2, which relates to reorganization by the Governor after the initial allocation.

On the other hand, *Soap* discussed the Governor's authority under the second paragraph of § 2 in depth:

> Subsequent to this initial reorganization, the Governor was empowered to make further changes through executive orders which could be disapproved by the Legislature. If not disapproved, the executive orders would have the effect of law. [*Soap, supra* at 742.]

In *Soap,* the Court considered whether the second paragraph of § 2 allowed the Governor to transfer rule-making power from one agency to another. The Court applied its two rules of constitutional construction. First, the Court considered "the sense most obvious to the common understanding," the one that "reasonable minds, the great mass of people themselves, would give it." *Id.* at 745.

> We have no doubt that the plain reading of the constitution would indicate to the common understanding that the term "function" inherently includes the accompanying "power" necessary to give life and substance to the "function." [*Id.* at 747-748.]

Next, the Court considered the second rule of

construction, "the circumstances surrounding the adoption of the constitutional provision and the purpose sought to be accomplished." *Id.* at 745. After examining the record of the Constitutional Convention, the Court determined:

> [T]he convention's purpose . . . was to grant the Governor *full legislative power* to promote the most efficient possible executive department. Recognition of the broad powers of reorganization granted is found in the provisions for legislative veto of the Governor's reorganization executive order, not in a diminution of power granted to the Governor. [Emphasis added. *Id.* at 747.]

Finally, the Court considered the Legislature's enabling act, the Executive Organization Act, for further support for the logic of the Court's interpretation. "Clearly, the Legislature considered 'powers' subsumed within the broader category of 'functions.'" *Id.* at 750. The Court noted:

> No specific considerations are provided in the Executive Organization Act for the art 5, § 2, activities—the subsequent reallocations by the Governor. Yet in *McDonald* this Court held that the act was the implementing legislation for the constitutional section. The fair implication of this interpretation is that the Governor, *in exercising his powers,* should use the transfer mechanism established in the Executive Organization Act, *i.e.,* the provisions regarding Type I through Type III transfers and the relationship between the departments and the transferred agencies.
>
> This is in fact the mechanism and terminology that has been used by the Governor in his executive orders. . . . Thus, rule-making power has repeatedly been transferred by the Governor, as a "function," within the scope of art 5, § 2. [Emphasis added. *Id.* at 750-751.]

The majority apparently believes that through the quoted language the Supreme Court held that the Executive Organization Act limits the reorganization authority granted to the Governor under the second paragraph of § 2. I disagree.

In making the quoted statement in *Soap,* the Court was considering only the transfer of rule-making powers from one agency to another. As noted by the majority, the only issue before the Court was whether the word "functions" in the second paragraph of § 2 would include the word "powers" in the first paragraph of § 2. The Court was not considering an extensive reorganization plan such as the one sought by the Governor under Executive Order 1991-31.

The language of the Court giving deference to the Executive Organization Act simply recognized that when transferring rule-making powers, as the Governor was authorized to do, the Governor should follow the procedure for transferring functions as prescribed in the Executive Organization Act. The Court did not hold, as the majority has, that the Governor's constitutional legislative powers to reorganize the executive branch may be limited or denied by an act of the Legislature.

To the contrary, the Court in *Soap* fully considered the doctrine of separation of powers and concluded that where, as in art 5, § 2, the constitution explicitly grants powers of one branch to another, there can be no separation of powers problem.

> Article 5, § 2, does not by any means vest "all" or any considerable legislative power in the executive. While it is true that *broad legislative power has been delegated to the Governor to effectuate executive reorganization,* this power is clearly limited. Three limitations must be emphasized. First,

the area of executive exercise of legislative power is very limited and specific. Second, the executive branch is not the sole possessor of this power; the Legislature has *concurrent power* to transfer functions and powers of the executive agencies. Third, the Legislature is specifically granted the power to veto executive reorganization orders before they become law. [Emphasis added. *Soap, supra* at 752.]

Because the Governor has concurrent legislative power with the Legislature under the second paragraph of § 2 to "make changes in the organization of the executive branch or the assignment of functions among its units," the Governor may accomplish by executive order in that limited area whatever the Legislature might accomplish by the enactment of a statute. Each has veto power over the other.

Legislative power is the authority to make, alter, amend, and repeal laws. *Harsha v Detroit,* 261 Mich 586, 590; 246 NW 849 (1933). State agencies created by legislative acts derive all their powers from those legislative acts, and those powers are at all times subject to the control of the Legislature. Such powers, also, in the absence of any constitutional regulation forbidding it, may be enlarged or diminished, extended or curtailed, or withdrawn altogether, as the Legislature may determine. *Id.* at 591.

The power to amend and repeal legislation, as well as to enact it, is vested in the Legislature, and the Legislature cannot restrict or limit its right to exercise the power of legislation by prescribing modes of procedure for the repeal or amendment of statutes; nor may one Legislature restrict or limit the power of its successors. *Atlas v Wayne Co Bd of Auditors,* 281 Mich 596, 599; 275 NW 507 (1937); see also *Frederick v Presque Isle Co Circuit Judge,* 439 Mich 1, 14; 476 NW2d 142 (1991). One

Legislature cannot enact irrepealable legislation or limit or restrict its own power, or the power of its successors, with respect to the repeal of statutes; and an act of one Legislature is not binding on, and does not tie the hands of, future Legislatures. *Atlas, supra* at 599.

Further, the Legislature's power is subject to the limitations and restrictions imposed by the state constitution. A statute that violates provisions of the state constitution will be declared unconstitutional. *Oakland Co Taxpayers' League v Oakland Co Supervisors,* 355 Mich 305, 323; 94 NW2d 875 (1959).

It follows, then, that the Legislature may not limit the broad concurrent legislative power of the Governor in this limited area. Therefore, although the Executive Organization Act was authorized under the first paragraph of § 2, it cannot limit the Governor's legislative powers to reorganize the executive branch "subsequent to the initial allocation" under the second paragraph of § 2. Having been granted concurrent legislative power to make changes in the organization of the executive branch under the second paragraph of § 2, the Governor may, by means of an executive order, make, alter, amend, and repeal laws that determine the organization or structure of the executive branch or of any of its units. The Governor is given the concurrent legislative power to determine which person or unit within his executive branch shall perform designated functions and to shift responsibility for performing the functions to that person or unit. The Legislature's remedy, if it disapproves of the proposals in the executive order, is to exercise its veto powers. If the Legislature fails to disapprove, the executive order becomes the law.

Accordingly, the Governor has the power to

amend or repeal any part of the Executive Organization Act that determines the organization or structure of the executive branch, or any of its units, including the Department of Natural Resources. Further, pursuant to his concurrent legislative power in this limited area, the Governor may effectively amend or repeal by executive order any laws that created the various boards and commissions in the Department of Natural Resources. Because the Department of Natural Resources and the boards and commissions were entities created by statute and were part of the executive organization, they were subject to organizational or structural change by executive order under the second paragraph of § 2. They could be abolished and their functions, including the appointment of the chair of the Department of Natural Resources and the holding of public hearings, could be transferred by executive order.

There is no indication from the language of the executive order, or from the record before us, that the statutorily created authority and functions of these boards and commissions are abolished or eliminated. The plain language of the general provisions of the executive order provides, in pertinent part:

All the statutory authority, powers, duties, functions and responsibilities of the Commission of Natural Resources and of the Department of Natural Resources . . . and of the director of the Department of Natural Resources and of the agencies, boards and commissions contained therein, including the function of budget, procurement and management-related function, and the functions set out more particularly in Part II below relating to natural resources management and the functions set out more particularly in Part III below relating to environmental protection are hereby

transferred to the director of a new Michigan
Department of Natural Resources . . . .

The transfer of the "statutory authority powers,
duties, functions and responsibilities" of these
boards and commissions to the director of the new
Michigan Department of Natural Resources is a
change in departmental organization or structure
authorized by the second paragraph of § 2. Al-
though certain boards and commissions have been
abolished, their functions remain intact.[1]

The fact that no Governor has ever attempted
such an extensive reorganization by executive or-
der in the past is not a basis for declaring that the
power does not exist. Constitutional and statutory
authority does not wither by disuse. See *Washte-
naw Co Road Comm'rs v Public Service Comm*, 349
Mich 663; 85 NW2d 134 (1957).

II

Applying the two rules of construction used in
*Soap* to the present case, it is apparent that the

[1] The majority has taken the position that public hearings have
been effectively abolished by Executive Order 1991-31 because of the
inability of the new Department of Natural Resources director and
his staff to handle the work load. The issue whether any statutorily
created right to a public hearing has been abolished because of lack of
resources was not considered or decided by the lower court and should
not be resolved by this Court on the record presented.

However, as was previously noted, pursuant to the express lan-
guage of Executive Order 1991-31, all the statutory authority, powers,
duties, functions, and responsibilities of the various boards and com-
missions have been transferred to the director of the new Department
of Natural Resources. Any statutory duty or responsibility to hold a
public hearing would be transferred under the language of Executive
Order 1991-31.

Furthermore, there can be no "right" to a public hearing where the
requirement of the hearing is established by rules or regulations of an
individual agency because the agency has the discretion to amend,
restrict, modify, or suspend its own rules. *International Union of Civil
Rights & Social Service Employees v Michigan Civil Service Comm*,
57 Mich App 526, 530; 226 NW2d 550 (1975).

Governor was given broad legislative power in the limited area of executive branch reorganization. Although the majority has cited these two rules, it has not applied them.

A

COMMON UNDERSTANDING RULE

A principal rule of constitutional construction is that the people who ratified the Constitution have accepted the words employed in the sense most obvious to the common understanding. *Council No 11, AFSCME v Civil Service Comm,* 408 Mich 385, 405; 292 NW2d 442 (1980).

The meaning of the words of the second paragraph of Const 1963, art 5, § 2, when read in context with the first paragraph of that section, is plain and obvious.

> Subsequent to the initial allocation, the governor may make changes in the organization of the executive branch or in the assignment of functions among its units which he considers necessary for efficient administration. Where these changes require the force of law, they shall be set forth in executive orders and submitted to the legislature. Thereafter the legislature shall have 60 calendar days of a regular session, or a full regular session if of shorter duration, to disapprove each executive order. Unless disapproved in both houses by a resolution concurred in by a majority of the members elected to and serving in each house, each order shall become effective on a date thereafter to be designated by the governor.

The phrase "subsequent to the initial allocation" means at any time *after* or *following* the legislative or gubernatorial allocation of the functions, powers, and duties of the then existing 123 execu-

tive and administrative offices, agencies, and instrumentalities to "not more than 20 principal departments" as mandated by the first paragraph of § 2, and directed by Const 1963, Schedule and Temporary Provisions, § 12.

The meaning of the following language,

> "the governor may make changes in the organization of the executive branch or in the assignment of functions among its units which he considers necessary for efficient administration. Where these changes require the force of law, they shall be set forth in executive orders and submitted to the legislature"

is clear and unambiguous. The Governor is given authority to make any change in the organization of the executive branch *or* in the assignment of functions, if the Governor believes the change is necessary for efficient administration. No restriction is imposed. The change may be minor, or it may be sweeping; it may be made even if it requires a change in the law. The "change" may be to add, alter, or delete, as long as it does not involve the creation of more than twenty departments, the limitation imposed by the first paragraph of § 2, or the abolition of a statutorily created function.[2] In this limited area of structuring the executive branch, the Governor stands in the same shoes as the Legislature.

Further, the constitutional grant of authority to the Legislature to promote natural resources under Const 1963, art 4, § 52 is also clear and unam-

---

[2] *The Random House College Dictionary, Revised Edition,* defines change as:

> 1. to make different the form, nature, content, future course, etc., of (something). 2. to transform or convert. . . . 3. to substitute another or others for; exchange for something else, usually of the same kind.

biguous.[3] The provision imposes a responsibility on the Legislature to preserve our natural resources. The language does not state that the organization and administration of an executive agency, having the responsibility for effectuating legislation protecting our natural resources, is placed under the sole control of the Legislature. Therefore, it is not a limitation on the Governor's concurrent legislative authority to reorganize the executive branch, including the Department of Natural Resources.

B

### CIRCUMSTANCES SURROUNDING THE ADOPTION

This "common sense" interpretation is borne out by the application of the "circumstances surrounding the adoption and the purpose to be accomplished" rule of interpretation.

The Constitutional Convention record is replete with discussions of the extent of executive reorganization power given to the Governor after the first three years following the adoption of the constitution has passed, and the initial allocation has been made.[4]

The legislative delegates on the committee, as

---

[3] Art 4, § 52 provides:

    The conservation and development of the natural resources of the state are hereby declared to be of paramount public concern in the interest of the health, safety and general welfare of the people. The legislature shall provide for the protection of the air, water and other natural resources of the state from pollution, impairment and destruction.

[4] 2 Official Record, Constitutional Convention 1961, pp 1842-1843, 1846-1851 sets forth the discussion regarding Mr. Bentley's proposed amendment of the second paragraph of § 2 that would have allowed legislative veto of an executive order by a majority of either house, rather than both houses:

    *Mr. Bentley:* . . . [W]e now come to the provision of the proposal of the executive branch committee dealing with the question of reorganization after the third year following the adoption of the constitution. As it was explained in the previous 2 paragraphs, we have provided for the initial period of 2

years for the legislature to reorganize. We have provided for the governor to act by executive order for the third year. The paragraph which is now under discussion contemplates reorganization actions *after* the third year.

. . . In this connection, Mr. Chairman, I would like to say that we do have, as Chairman Martin outlined, of course, I believe, a 4 year old statute [1958 PA 125] which does provide for the reorganization as carried out by the statute at the present time. . . .

Writing a reorganization plan into the constitution, Mr. Chairman, is admittedly somewhat of a novelty. *I believe there is only one other state at the present time that does have a provision in its state constitution for executive reorganization and legislative approval or disapproval. Nevertheless, the members of the committee on executive branch, I believe unanimously, agreed on the concept of writing it into the constitution as a forward looking step permitting more effective and more efficient reorganization over future years of our state government.* . . . We did differ as to whether it should be difficult or easy, relatively speaking, for the legislature to approve or disapprove those executive reorganization plans as submitted by the governor.

\* \* \*

*Mr. Pollock:*

\* \* \*

It seems to me, Mr. Chairman, that the problem is one of administrative organization and here, it seems to me, the governor is in a much better position to know what is needed within his own administrative structure than anybody else. I think certainly the legislature should have the power to veto any proposal that is not in the public interest, but I do not think that this should be made easy, and I think it is not too difficult by requiring the majority of both houses. Therefore, I am opposed to the Bentley amendment.

\* \* \*

*Mr. Hutchinson:* . . . Instead of giving to the legislature the lawmaking function in these reorganization plans, and to the governor a veto, you are giving to the governor, in effect, the power to make the law and you are according to the legislature a veto.

\* \* \*

I call your attention to this again: this is a tremendous political power, this power to reorganize. And I am not willing to agree, offhand, that just because the governor thinks that a particular reorganization is in the best interests of the government, that that necessarily makes it so. I think that the governor also can make some mistakes or be misled, or be influenced by groups or be influenced by considerations, which in the minds of other people, might not be in the best interests

of the state. Consequently, when you subject the governor's reorganization to the test of veto by either house, you are simply applying in a reverse sort of arrangement, the same principle which we have always had.

. . . I think that it would be extremely bad public policy to, in effect, permit the governor to reorganize the executive branch in any way that he saw fit without any real effective legislative veto, and then, at the same time, expect the legislature to come forth and produce the money with which to carry on, perhaps, increased programs and different emphasis upon programs brought about because, as I said yesterday, I can well imagine that a governor may be dissatisfied with the emphasis or the way that a particular program is being carried on in one department and think that he can get a better treatment of it somewhere else, it can be expanded somewhere else; perhaps the head of another department is more friendly with the governor and they can expand the program to the political benefit of the governor, and the legislature will be expected to provide the money, and at the same time you have effectively denied the legislature any positive or effective role in asserting what it thinks to be the best interests of the state of Michigan. After all, the legislature, too, is elected by the people, is answerable to the people, not statewide but by constituency, and for those reasons, I think that the Bentley amendment is a good one, that at least it won't be as bad a system as it would be if you, in effect, denied to the legislature the power of veto.

*Mr. Pollock:*

\* \* \*

I think the history of administrative reorganizations and the failure to have administrative reorganization clearly points to the excellence of this device, and the only point at issue is whether you want it to be very easy for the legislature to knock down a proposal which, as Mr. Hutchinson—I think, with a great deal of exaggeration—indicates that it is a fearful exercise of power by the governor, it is the kind of administrative authority which any general manager of a business would insist upon having, if he couldn't rearrange his own administrative structure to promote the efficiency of the organization, he wouldn't want to be general manager. It is, of course, a matter of power; but the question of power, and calling it a traditional way of doing things doesn't make a bad institution good. And the fact simply is, as I see it, either you want to promote flexibility in administrative structure, and thus to permit the abolition of useless agencies, the combining of others, or you want to make it so difficult that, in fact, it is not going to be accomplished.

It is true that we have a statute in Michigan, one of the few states that have such a statute, permitting this power by the governor. But again, the experience of our legislature in the exercise of their veto over the governor's power gives nobody any encouragement that it will ever get anywhere if it remains

as easy as that, and that is why the committee, in its wisdom, I think, provided that it would take a veto by both houses . . . .

\* \* \*

*Mr. Binkowski:*

\* \* \*

But I am not criticizing the legislature for not acting in executive reorganization. However, I think basically the reason for having this form is to place the responsibility with the executive, who should know all about these administrative agencies, and to allow him to initiate the programs, and therefore present them to the legislature. I think the reason for executive reorganization is simply economy and efficiency in government.

Now, I think all of you who have been in government know that we have a certain number of bureaucrats. We have people who build empires. They don't want these empires consolidated or eliminated. If you are going to go ahead, as we have done, and give the executive the responsibility of lowering appropriations, then I think you have to give him the responsibility in this area of his executive departments, so that he can eliminate or consolidate in the best interest of the state. . . .

A third point I would like to call to your attention is that the legislature does appropriate funds, so that if they are unhappy with any extension of power, so called power by the governor, if the governor should create a new agency which they are dissatisfied with, they can effectively reduce the effectiveness of that organization. For these reasons, I oppose the amendment.

\* \* \*

*Mr. Durst:*

\* \* \*

. . . What I am really saying here is, we should at least consider the desirability of allowing the governor as free a hand as possible to keep this thing in order. . . .

\* \* \*

*Mr. Wanger:* Mr. Chairman, members of the committee, it is quite clear that efficiency and not politics should be the guide and the motivation behind these executive reorganizations. It is also clear that we need to have some kind of a check upon them, as the committee in its proposal recommends when it allows the legislature to have any voice in this regard.

Now, it seems to me that the merit of the proposed amendment is this: you see, under the proposal as set forth in the committee report, if the governor or his party have strong control of either house, or perhaps just some of the committees thereof, he could ram through a politically motivated reorganization.

It is true that there are reasons on the other side, but let us remember this very simple fact, that reorganization can be

used for political purposes and the temptation may always be there, to some extent, to make such use of reorganization. I, therefore, suggest that, as a practical matter of political management and efficient management, considered side by side together, as they must, it would be best to adopt this amendment to get around that difficulty.

\* \* \*

*Mr. DeVries:* . . . I think a more important reason for not getting administrative reorganization in the legislature is in the tendency to trade among legislative supporters for various agencies, and to prevent their favorite agencies from being consolidated or reorganized with others. And this always effectively blocks reorganization, particularly when it is easy to get a majority vote. Therefore, I would urge the defeat of the Bentley amendment. It seems to me if you try to depend on the legislature to accomplish rational administrative reorganization you are never going to get it done.

\* \* \*

*Mr. Hutchinson:*

\* \* \*

. . . I have been told by the members of the governor's committee working on these reorganization plans that, as time goes on, and they attempt to get into more major fields, their task becomes infinitely greater and more difficult, and the likelihood of achievement is much harder. That isn't because people are objecting to economy or anything of the sort. At the base of this thing is what I said before, a fear—and a genuine fear—of the concentration of political power. If you are going to concentrate—and it is a tremendous political power, even though Dr. Pollock thinks I exaggerate; I do not believe I do, I feel very strongly about this, and I want to, as best I can, convey to the delegates here the seriousness of vesting in a single man, who is the head of a political party, this tremendous political power to completely reorganize his executive branch of government to suit his political purposes. I am not here to say that that would customarily happen, but I can envision that it might. It was such kinds of concentration of political power in the hands of people overseas in Europe which completely destroyed liberty. I don't think that the people of Michigan would let it go that far, knowingly, but I would hate to see you write into our state constitution a system where constitutionally such strange things could be brought about under the guise of governmental reorganization.

\* \* \*

*Mr. Brake:* . . . It isn't a matter of theory with me. I can remember, in the senate, when the governor proposed and the legislature followed him in the complete abolition of a department and its reorganization for the one and only purpose of getting members of one party off the board and putting on the

members of the other. I wouldn't go along, and for a time I was regarded as an outlaw in my party, and I think Mr. Chase will remember that I was the only member of the party that wouldn't stand for it. Oh, it is used, it has been used and it will be used again.

\* \* \*

*Mr. Martin:* Judge Leibrand, this involves 2 processes. The preceding 2 paragraphs, as has been commented on by some of the delegates, deal with this problem of initial reorganization. After that 3 year period is completed, in which first the legislature, and then if the legislature does not do it, the governor has a chance to work out a general reorganization plan, then you have, into the future and for the future, a continuing reorganization proposal which is different from that as to this initial reorganization, and this continuing reorganization authority, which rests both in the governor and the legislature. After this initial reorganization is completed, then the governor may propose plans and the legislature is given the veto power on those plans as is provided here. And it is that later process of reorganization proposals coming from time to time, from year to year or 10 years to 10 years, that we are dealing with here. . . .

\* \* \*

*Mr. Leibrand:* What I am trying to get at, Mr. Martin is this: could each successive or subsequent governor reorganize these departments according to his personal interests or the interests of his party, and would these successive reorganizations stand unless vetoed by a majority of the members elect of both houses of the legislature? Would that go on into the future every time we have a new governor?

*Mr. Martin:* Certainly, any governor can propose a plan of reorganization subject to legislative veto.

*Mr. Leibrand:* By a majority of the members of both houses?

*Mr. Martin:* That is correct.

\* \* \*

*Mr. Madar:*

\* \* \*

Frankly, I say this: that I can't see why you would want to take out of the hands of the executive branch the setting up of the administration of your government. Businessmen operate or try to operate a good businesslike administration. Politicians, on the other hand, want these things in the hands of the legislators where they can manipulate and maneuver. I say this: for the sake of the people of the state of Michigan, give the administrative end the right to do this and if it isn't done properly by the governors, believe me, those people who elected them will also throw them out. Let's get good business administration in the state of Michigan. [Emphasis added.]

well as others, argued that the language now contained in the second paragraph of § 2 gave the Governor powers that were too broad, that the Governor was being placed in the same position as the Legislature and could change the laws relating to executive reorganization for political purposes, that the Governor already had sufficient power to submit reorganization plans to the Legislature under the now-repealed 1958 PA 125, MCL 16.1 *et seq.*; MSA 3.28(1) *et seq.*, and that each incoming Governor could entirely revamp the executive branch. In spite of all these concerns, which were well known and understood by the delegates, the constitutional language in the second paragraph of § 2 giving the Governor concurrent legislative power was adopted.

C

### PRESERVATION OF VALIDITY OF ALL CONSTITUTIONAL PROVISIONS

A third rule of constitutional construction has been recognized by our Supreme Court. It provides "that wherever possible an interpretation that does not create constitutional invalidity is preferred to one that does." *Council No 11, supra* at 405. If we hold that the Governor may not reorganize the executive branch after a reorganization has been implemented by the Legislature pursuant to the first paragraph of § 2, we will invalidate the second paragraph of § 2. The preferred interpretation, then, would be to recognize that the Governor's reorganization powers exist after the initial allocation.

Having applied the rules of construction, it is apparent that the second paragraph of § 2 grants

The Bentley amendment was subsequently defeated, and the language of the second paragraph of § 2 was adopted.

the Governor concurrent power with the Legislature to completely reorganize the executive branch, not merely to transfer functions from one agency to another. The Governor's power with respect to reorganization of the executive branch, subject to veto by the Legislature, is akin to that of a chief executive officer of a corporation whose actions are subject to the veto of a board of directors. See *Soap, supra* at 744. Because the Governor's legislative powers to reorganize and to transfer functions are concurrent with the legislative powers given to the Legislature in this area, the Governor has the same authority to make changes in the law as does the Legislature, even to amend the Executive Organization Act.

III

Appellees also argue that the power "to make changes in the organization of the executive branch" does not permit the Governor to abolish the Department of Natural Resources because that phrase in the second paragraph of § 2 was derived from the now-repealed 1958 PA 125, MCL 16.5; MSA 3.28(5), which limited the areas in the organization of the executive branch in which the Governor might propose reorganization. I disagree.

First, although Executive Order 1991-31 states that the existing Department of Natural Resources is abolished, it also, at the same time, establishes a new Department of Natural Resources with a new and different organizational structure to take the place of the one abolished. To argue that the Department of Natural Resources has been abolished by Executive Order 1991-31 when, by that same order, a Department of Natural Resources clearly exists, although with a different structure, places form over substance.

Secondly, the constitutional authority granted the Governor under the second paragraph of § 2 is broader than that granted pursuant to 1958 PA 125. Section 5 of that act provided in pertinent part:

> Reorganization plans shall relate only to abolishing or combining agencies in the executive branch of the state government or to changing the organization thereof or the assignment of functions thereto, and each such plan shall contain, where appropriate the provisions necessary to effect:
> . . . .

Appellees contend that because the phrase "[r]eorganization plans shall relate only to abolishing or combining agencies in the executive branch" was not included in the second paragraph of § 2, the Governor does not have the authority to abolish a department, but may only "change the organization thereof." This argument must fail because the phrase "change the organization thereof" refers to the previous language, "agencies in the executive branch." The language in the second paragraph of § 2 is not so limited. It permits the Governor to "change the organization *of the executive branch*," not just an agency within the executive branch. See the discussion by constitutional delegates relating to extensive grants of power set forth in footnote 4, *supra.*

IV

Finally, the Michigan Environmental Protection Foundation argues that Executive Order 1991-33 is invalid because it is an unconstitutional delegation of rule-making power to a board created by the Governor. However, it is clear from the language of the order that the science board is designed to

act in an advisory capacity only. Executive Order
1991-33 provides that the science board may, at
the request of the Governor, review proposed or
existing environmental standards, procedures for
establishing certain permit or operating license
conditions, and staff recommendations for denial
or approval of permit and license applications. The
board is only authorized to make findings and
recommendations to the director of the new De-
partment of Natural Resources, who is responsible
for making the final determination. Thus, the role
of the board is one that is advisory in nature. See,
e.g., *Lucas v Wayne Co Bd of Road Comm'rs,* 131
Mich App 642, 662; 348 NW2d 660 (1984). The
Governor has not delegated decision-making pow-
ers to the science board, because the ultimate
decisions rest with the department director.

## V

I conclude, then, that the Governor's proposal in
Executive Order 1991-31 to restructure the Depart-
ment of Natural Resources by abolishing the old
department and creating a new one, to reassign
the functions of the Natural Resources Commis-
sion, to appoint and assign responsibilities to the
director, to abolish various boards and commis-
sions, and to transfer their functions is a constitu-
tionally valid exercise of the Governor's legislative
authority and does not violate the separation of
powers doctrine. The Legislature's remedy, if it
does not approve, is to exercise its veto power.

I would reverse the rulings of the trial court
that the Governor exceeded his constitutional and
statutory authority, that Executive Order 1991-31
was in violation of the separation of powers clause
of the Michigan Constitution, that the Governor
lacked authority to appoint the new head of the

Natural Resources Commission, and that the Governor was not empowered to abolish commissions and boards whose functions include the holding of public hearings. Further, contrary to the majority, I would uphold the validity of Executive Order 1991-33, creating an investigatory and advisory board.